■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT STEPHENS, Appellant.—Judgment, Supreme Court, Bronx County (Robert Seewald, J.), rendered October 22, 1985, convicting defendant of criminal possession of a controlled substance in the second degree and sentencing him to an indeterminate sentence of 8⅓ to life imprisonment, reversed, on the law and the facts, the motion to suppress granted and the indictment dismissed.

Prior to the jury trial in this action, the defendant made a motion to suppress physical evidence consisting of cocaine, drug paraphernalia, a knife, a bulletproof vest and United States currency. We believe that the trial court erred in denying the motion to suppress. The evidence given at the hearing on the motion to suppress was undisputed. Police Officers Daniel Gaughran and Mark Eberhart were the only witnesses. On April 25, 1984, at approximately 2:30 P.M., the two officers were in uniform in a police car in the vicinity of 167th Street and Sedgwick Avenue in The Bronx, New York City. They received a call on the radio that there was "a male, black wearing gray pants, gray jacket, standing in front of Stadium Motor Lodge," who had a gun. They proceeded to the motor lodge. When they arrived, they saw a man fitting the description given on the radio in the lobby of the motor lodge. They entered the lodge with their guns drawn and ordered the defendant to put his hands up. Officer Gaughran proceeded to frisk the defendant. During the frisk Officer Gaughran discovered that the defendant was wearing a bulletproof vest under his jacket. The said officer also felt a hard, tubular object in defendant's right front pocket. He reached into the pocket and pulled out the object which contained a white powder subsequently found to be cocaine. At that point, the defendant was placed under arrest. The officers continued to search the defendant and Officer Eberhart recovered from inside defendant's underwear a plastic bag with white powder, later determined to be cocaine. The officers also found several bags

on the floor next to the defendant which contained drug paraphernalia, small plastic bags with white powder and a knife.

At the time of the radio run, the police officers were told that a man with a gun was standing in front of the motor lodge. The police had apparently received a call from a woman who identified herself as Barbara Williams in room 128 of the motor lodge. Allegedly, she is the one who called the police with a message that a man with a gun was outside the motor lodge. She was not called during the suppression hearing. Moreover, both police officers testified that they made no effort to locate Barbara Williams or to verify that she was the person who called the police. Thus, Barbara Williams cannot be equated with the citizen informants whom police officers spoke to in person in the cases cited by the trial court. Specifically, in *People v Finlayson* (76 AD2d 670 [2d Dept 1980], *lv denied* 51 NY2d 1011, *cert denied* 450 US 931) and *People v Crespo* (70 AD2d 661 [2d Dept 1979]), the victims of the robberies directed the police towards the persons who were questioned and arrested. In *People v Sanders* (79 AD2d 688 [2d Dept 1980]), it appeared that the police approached the defendant following a conversation with a woman. The substance of the conversation with the woman was not revealed at the suppression hearing. Nevertheless, when the police officer approached the defendant who had boarded a subway train, the officer saw a gun on the floor near the defendant and at a spot from which the defendant appeared to be withdrawing his hand. In *People v Cantre* (95 AD2d 522 [2d Dept 1983]), *affd* 65 NY2d 790 [1985]), the Appellate Division upheld a search warrant issued on the basis of information received from an informant who had observed certain items allegedly seized in a burglary and had conversed with one of the persons who had allegedly committed the burglary.

In this case, the police had only a common-law right to inquire when they approached the defendant. *(People v De Bour,* 40 NY2d 210.) In *De Bour* the Court of Appeals noted four different approaches governing police-citizen encounters. They are as follows: "The minimal intrusion of approaching to request information is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality *(People v De Bour, supra).* The next degree, the common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explan-

atory information, but short of a forcible seizure *(People v Cantor,* 36 NY2d, at p 114, *supra; People v Rosemond,* 26 NY2d 101; *People v Rivera,* 14 NY2d 441, 446, and authorities cited therein). Where a police officer entertains a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor, the CPL authorizes a forcible stop and detention of that person (CPL 140.50, subd 1; see *Terry v Ohio,* 392 US 1; *People v Cantor, supra).* A corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed (CPL 140.50, subd 3). Finally a police officer may arrest and take into custody a person when he has probable cause to believe that person has committed a crime, or offense in his presence (CPL 140.10)." *(Supra,* 40 NY2d, at 223.)

The suppression of the evidence in this case is required by *People v La Pene* (40 NY2d 210 [decided together with *People v De Bour, supra])* and *People v Stewart* (41 NY2d 65 [1976]). In *La Pene,* police officers in uniform and on radio motor patrol received a radio message that there was a male Negro with a gun who was wearing a red shirt in a bar. When the police arrived at the bar, they went up to La Pene, ordered him to "freeze", proceeded to frisk him and discovered a gun. The Court of Appeals ordered suppression of the gun. No effort had been made to question the defendant La Pene or anyone else prior to his frisk and search. Here, no effort was made to question the defendant or anyone else at the motor lodge before defendant was directed to raise his hands and submit to a frisk.

In *Stewart (supra),* a police officer was in uniform on radio motor patrol when he received a message that a male Negro with a gun and wearing a long green coat was standing in front of a specific address in Brooklyn, New York City. The officer proceeded to the area and saw the defendant among a group of several other persons. The officer called Stewart over and as Stewart approached him, the officer noticed a bulge in his left trouser pocket. The officer could not tell if the bulge was a gun. Nevertheless, he touched the outside of Stewart's pocket and felt a hard, cylindrical object which he knew was not a gun. The officer proceeded to reach into Stewart's pocket and found eight .38 calibre bullets. The defendant Stewart was then frisked and a gun recovered from a shoulder holster.

In holding that the gun found on Stewart should have been suppressed, the Court of Appeals cited the *De Bour* case and

stated that the police officer had only a common-law right to inquire. Specifically, the Court of Appeals said *(supra,* at 69): "In light of the principles articulated in *La Pene (supra)* it is clear that where an anonymous phone tip giving a general description and location of a 'man with a gun' is the sole predicate, it will generate only a belief that criminal activity is afoot *(People v Cantor,* 36 NY2d 106; *People v De Bour, supra).* That type of information will not of itself constitute reasonable suspicion thereby warranting a stop and frisk of anyone who happens to fit that description *(People v La Pene, supra;* CPL 140.50). In that situation, the police have only the common-law power to inquire for purposes of maintaining the *status quo* until additional information can be acquired *(Adams v Williams,* 407 US 143, 145)."

It is equally true here that the officers had no right to seize the object in the defendant's pocket prior to making some inquiry as to what the object was. The police officer testified that it did not feel like a gun. In fact, no gun was found on the person of the defendant or in the bags which were near him. Therefore, even if the police had a right to frisk the defendant because of fear for their own safety, there was no right to search him prior to an inquiry or investigation of the source of the radio run. Concur—Carro, Ellerin and Smith, JJ.

Kupferman, J. P., dissents in the following memorandum: Although the court's memorandum may lead to the conclusion that all citizens need protective devices such as bulletproof vests, it is not yet the fashionable mode of dress for everyday wear.

The Sunday Times of February 21, 1988 (section F, at 15) under the title "Pinstripe Suits With Kevlar Vests", has the following statement: "One complement to a pinstripe suit, for example, could be a matching vest that can withstand a .357-caliber bullet. The vests, made with Du Pont Kevlar, cost between $300 and $700, depending on the style and degree of resistance to bullets. If vests seem stuffy, there are stylish bullet-resistant safari jackets, raincoats, undershirts and dress shirts."

It matters not that the person fitting the description given on the 911 radio run was inside the motel rather than in front of it. He could not have been expected to stand there and wait for the police to arrive. Moreover, with the radioed information that the suspect had a gun, the police were justified in patting down the suspect who fit the description, and when they found that he was wearing a bulletproof or body vest, it

was obligatory that they search further (CPL 140.50), especially in view of: "Unlawful wearing of a body vest. 1. A person is guilty of the unlawful wearing of a body vest when acting either alone or with one or more other persons he commits any violent felony offense defined in section 70.02 while possessing a firearm and in the course of and in furtherance of such crime he wears a body vest." (Penal Law § 270.20 [1].)

Ross, J., dissents in part and would remand for further proceedings.