OPINION OF THE COURT
Roger S. Hayes, J.
Defendant was indicted for criminal possession of a controlled substance in the first degree. Defendant moved to sup *238 press cocaine recovered from his shopping bag as well as his statements to the police. The court conducted a Mapp/Huntley hearing. Based on the findings of fact and conclusions of law stated below, defendant’s motions to suppress are denied.
Findings of Fact
The People presented a single witness, Police Officer George Hellmer. Defendant did not present any witnesses. The court finds that Officer Hellmer testified openly, did not attempt to avoid difficult questions, and did not appear to conform his testimony to meet constitutional requirements.
Despite defendant’s sustained cross-examination and vigorous attacks on Officer Hellmer’s credibility, the court finds that he was a credible witness. In essence, Officer Hellmer was an experienced police officer, trained to make quick observations, and was already familiar with the location where he observed defendant. His keen observations, while in a moving car, of defendant’s ethnicity, clothing and the bag he was carrying were credible. Based on his credited testimony, the court makes the following factual findings:
At 4:39 p.m., on April 3, 2002, a man called 911 and reported that he had just seen a young man waving a gun at the corner of West 174th Street and Amsterdam Avenue.[1] The caller described the youth as Hispanic, no more than 14 years old, and wearing a blue jean suit. He also specified that the youth kept taking the gun in and out of a brown bag. Although the caller would not give his name, he revealed that he had a store at that location and that the youth had tried to rob him.
At 4:42 p.m., Officer Hellmer and his partner Officer Steve Tirado, both in uniform and in a marked police patrol car, received a police radio transmission of a man with a gun at 174th Street and Amsterdam Avenue. The transmission specified that the man was Hispanic, dressed in a blue jean suit, and kept the gun in a brown paper bag. The transmission omitted that the perpetrator was not more than 14 years old.
When Officer Hellmer and his partner arrived at the location about a minute later, Officer Hellmer observed defendant walking toward the entrance to the apartment building at 509 West 174th Street, about 100 feet west of the reported intersection. Defendant, a Hispanic male in his 30s or 40s, was wearing a blue denim jacket and dark blue denim jeans and carrying a beige or tan shopping bag.
*239 Defendant entered the vestibule of the building and looked outside through the glass window which comprised the upper half of the door. As Officer Hellmer and his partner approached the door, he observed through the same window defendant make a dipping motion as if dropping something to the ground and then pacing in circles. Officer Hellmer and his partner entered the vestibule of the building. Inside the vestibule, Officer Hellmer saw on the ground the shopping bag that defendant had been carrying. Defendant was standing a few feet away from the bag and was the only person present in the vestibule and lobby.[2]
Officer Hellmer asked defendant if he lived in the building.[3] Defendant replied that he did not and explained that he was waiting for somebody. Officer Hellmer asked defendant about the bag; defendant stated that it did not belong to him. When Officer Hellmer told defendant that he saw defendant carrying the bag to the building, defendant repeated that the bag was not his.
Officer Hellmer picked up and squeezed the shopping bag, felt a hard object inside, and pulled out a package approximately eight inches wide, six inches deep, and two inches thick wrapped in a black plastic bag. When questioned by Officer Hellmer about the package, defendant, who appeared nervous and nearly trembling, again stated that it did not belong to him and that he knew nothing about it. Officer Hellmer opened the black plastic bag and found a “brick” of cocaine encased in plastic wrap. The officers then arrested defendant.
Conclusions of Law
At a Mapp hearing, the People have the burden of establishing the lawfulness of the police conduct in the first instance. (See People v Berrios, 28 NY2d 361 [1971]; People v Malinsky, 15 NY2d 86 [1965].) The defendant, however, has the ultimate burden of proof to establish the illegality of the police conduct. (See People v Baldwin, 25 NY2d 66 [1969].)
Reasonableness is the touchstone of any inquiry into the propriety of police conduct in a police-citizen encounter. (People *240 v Batista, 88 NY2d 650, 653 [1996].) A court must weigh the degree of intrusion that such conduct entails against the precipitating and attending circumstances. (People v De Bour, 40 NY2d 210, 223 [1976].) In this case, the police conduct was reasonably related in scope and intensity to the level of information available to the officers at the time they took action. Indeed, the officers acted lawfully under the common-law right to inquire.
The common-law right to inquire is activated by a founded suspicion that criminal activity is afoot and permits a police officer to interfere with a citizen to the extent necessary to gain explanatory information but does not allow a forcible seizure or frisk. (People v Hollman, 79 NY2d 181, 184-185 [1992]; People v De Bour, 40 NY2d at 223.) Initially, it is clear that the officers did not forcibly seize or even stop defendant when they approached and questioned him. Defendant had entered the building and had stopped moving on his own accord prior to the officers’ approach. Defendant stood and remained in the vestibule as the two uniformed officers walked into the building. These officers did not run after defendant, draw their guns, direct defendant to stop, or physically detain defendant in any way. They simply asked a few questions. This brief encounter bespoke no violent or forcible apprehension. Such police conduct did not significantly interfere with defendant’s liberty of movement. (See People v De Bour, 40 NY2d at 216; People v Cantor, 36 NY2d 106, 111 [1975].) Thus, contrary to defendant’s characterizations (defendant’s mem at 8, 11, 16), the officers’ actions did not constitute a “stop,” “seizure” or “detention” of defendant. (See People v Bora, 83 NY2d 531 [1994]; People v Boyd, 91 AD2d 1045 [2d Dept 1983].)
The information communicated in the radio run provided Officer Hellmer with an adequate basis for him to undertake the common-law right to inquire. (See People v McNatt, 65 NY2d 1046 [1985]; People v Bora, 191 AD2d 384 [1st Dept 1993], affd 83 NY2d 531 [1994].) Although the source of the information transmitted was an anonymous citizen informant, it still provided a founded suspicion justifying the officers’ initial approach and inquiry of defendant who closely matched the transmitted description. (See People v Stewart, 41 NY2d 65, 69 [1976]; People v Brown, 216 AD2d 3 [1st Dept 1995]; People v Stephens, 139 AD2d 412 [1st Dept 1988].) The radio run they received described a Hispanic man wearing a blue jean suit at a specific location carrying a brown bag containing a gun. The officers were rightfully and dutifully on the scene within *241 minutes of the radio run. (See People v Benjamin, 51 NY2d 267, 270 [1980] [police are duty-bound to investigate radio report of man with gun].) As experienced police officers, they studied the location searching for any individual who might resemble the transmitted description. Defendant was near the reported location and was the only individual who closely matched the description received by the officers. Indeed, defendant was a Hispanic man, wearing a blue jean suit, which consisted of a blue jean jacket and pants, and was carrying a beige or tan bag. Since defendant closely matched the transmitted description and was observed in close temporal and physical proximity, the officers appropriately approached defendant to make an inquiry. (See People v Andrews, 243 AD2d 321 [1st Dept 1997] [anonymous tip that gives general description and location of individual with gun furnishes police with common-law right to inquire]; People v Douglas, 227 AD2d 130 [1st Dept 1996] [radio transmission describing man with gun and defendant matching description provided common-law right to inquire].)
Furthermore, the subsequent police conduct was reasonably limited in scope and intensity to the circumstances which rendered its initiation permissible. The officers did not stop and frisk defendant. The officers did not immediately seize and search the bag. Officer Hellmer first asked only a few pertinent questions. He inquired if defendant lived in the building and what he was doing there. And, in light of the radio report that the suspect had a gun inside a brown bag, the officer naturally asked about defendant’s bag. (See People v Rogers, 259 AD2d 398 [1st Dept 1999] [common-law inquiry including request to view contents of plastic bag defendant was holding ruled lawful]; People v Boyd, 91 AD2d at 1046 [officer’s inquiry about contents of defendant’s bag properly based on common-law right to inquire].) Thus, the officers lawfully approached defendant and reasonably questioned him, and, absent an arbitrary intrusion, based upon whim, curiosity or caprice or with an intent to harass, there was no constitutional violation. (See People v De Bour, 40 NY2d at 217.)
Thereafter, the officers’ common-law right to inquire, properly exercised, escalated to reasonable suspicion that criminality was afoot. Indeed, defendant surprisingly denied ownership of the bag he had just been carrying. Defendant appeared nervous and was almost trembling. He claimed that he knew nothing about the contents of the bag and unequivocally denied his ownership three times. Thus, defendant’s own *242 conduct provided the officers a reasonable suspicion of criminality. (See People v Douglas, 227 AD2d at 130 [when officers approached to inquire, defendant’s rapid retreat from police, refusal to stop, and hand movements near waistband provided reasonable suspicion]; People v Flores, 226 AD2d 181 [1st Dept 1996] [common-law right to inquire escalated to reasonable suspicion by defendant’s efforts to conceal waistband bulge]; People v Brown, 216 AD2d at 3 [defendant’s throwing motion toward his mouth elevated common-law right to inquiry for drug sale to reasonable suspicion].)
Moreover, the search of defendant’s bag was lawful because defendant abandoned it prior to the search. (See People v Murray, 256 AD2d 116 [1st Dept 1998].) When an individual voluntarily and knowingly discards personal property, he relinquishes any reasonable expectation of privacy in the abandoned item. (People v Ramirez-Portoreal, 88 NY2d 99, 110 [1996].) As a result, the police may seize and search the property, provided that the abandonment itself was not provoked by illegal police conduct. (People v Leung, 68 NY2d 734 [1986].) The People must prove that the defendant intended to relinquish any expectation of privacy in the property. (People v Howard, 50 NY2d 583, 593 [1980].)
Here, defendant’s intent to abandon the bag was unequivocally manifest. Defendant had carried the bag into the building even before the officers approached. After looking toward the uniformed officers’ direction as they approached the building, defendant dropped the bag and walked away from it. When the officers entered the building, the bag was on the ground in the vestibule, an area accessible to any person entering or exiting the building. Prior to any police questioning, defendant had already moved a few feet away from the bag. Furthermore, when lawfully questioned about the bag, defendant disclaimed ownership and any knowledge of the bag a total of three times. Defendant even denied his ownership despite Officer Hellmer’s direct assertion that he had seen defendant carrying the bag. Thus, defendant’s physical relinquishment and his repeated verbal disclaimers of ownership clearly demonstrated a deliberate and calculated decision to abandon the bag. (See People v Anderson, 268 AD2d 228 [1st Dept 2000]; People v Gabriel, 264 AD2d 641 [1st Dept 1999]; People v Encarnacion, 175 AD2d 874 [2d Dept 1991].) Since the search of the bag followed defendant’s abandonment, the cocaine found inside was not the fruit of an illegal search. Thus, defendant was lawfully arrested pursuant to the recovery of the cocaine.
*243 Defendant, however, argues that the initial police approach was improper because the radio transmission was incomplete. Although the radio transmission relayed accurate information about the suspect’s description and location, it did not convey that the suspect was described as no more than 14 years old by the anonymous caller to the 911 operator. Relying on People v Lypka (36 NY2d 210 [1975]), and People v Jennings (54 NY2d 518 [1981]), defendant argues that the 911 operator’s knowledge that the suspect was no more than 14 years old must be imputed to the receiving officers. Defendant concludes that, based on such information, the police had no reason to approach defendant who was over 40 years old (defendant’s mem at 12-14).
Defendant’s reliance on Lypka and Jennings to apply the stricter standards applicable to searches and arrests to the police conduct here is misplaced. Those cases resolved whether information transmitted by a fellow officer or a police computer record supplied probable cause to search or to arrest the defendant. {People v Jennings, 54 NY2d at 520; People v Lypka, 36 NY2d at 213.) Here, the police did not initially stop, search, or arrest defendant. They simply exercised the common-law right to inquire without more intrusive police action. As discussed above, this was proper based on the information they received.
Also, here the officers did not act based on stale and incorrect information from a police database (People v Jennings, 54 NY2d at 521), but instead acted upon incomplete, yet accurate, information originating from a 911 call. It is reasonable to require law enforcement agencies to maintain accurate, current database records if they wish to rely on them as a basis to establish probable cause. This is a standard relatively easy to meet. Failure to do so, as in Jennings, should be deterred. On the other hand, a quickly unfolding police investigation on the street, dependent on swift, multiple communications between civilian 911 operators and members of the police communications division and officers on the street cannot be held to the same standard. When a civilian 911 operator immediately relays the reported information to a police dispatcher, who in turn immediately relays it to officers on the street, who in turn may also relay the information to other officers, certain details may not always be communicated. This is inherent in the communication process and thus probably impossible to deter. In this light, the police failure to transmit the complete description in this case was understandable and certainly was not fatal.
*244 Indeed, even if the radio transmission had included the suspect’s estimated age, the officers’ approach and inquiry of defendant would still have been reasonable. Many descriptions that are received by the police are incorrect but close enough to justify inquiry. (See, e.g., People v Hicks, 68 NY2d 234, 237 [1986] [radio report of robbers in green Pontiac justified stop of gray and black Buick]; People v Brnja, 50 NY2d 366, 370-371 [1980] [arrest of defendant proper although his clothing did not match description provided by victim].) Here, Officer Hellmer stated he would have investigated defendant even if he had known the suspect was no more than 14 years old. Again, during cross-examination, he explained that:
“He was in close proximity to the location where the 911 call was supposed to be, where the person with the gun was. He was wearing the blue denim jacket and blue denim jeans similar to what — a blue similar to what I would consider a blue denim suit to be. He was carrying a paper bag which was beige or tan in color which I felt to be similar to what a brown paper bag could be. And there was already two or three cars present at the intersection of West 174th Street and Amsterdam so I knew that anything at that corner would be investigated by them and I would take a look at the person who was in proximity to the location.” (H: 65).
Since defendant matched every other element of the description, was carrying a beige or tan bag, and was present at the right time and place, it was good thorough police work to make an inquiry of defendant. (See People v Gaines, 159 AD2d 175, 177 [1st Dept 1990] [officer’s observations at the scene did not match all details provided in radio run but provided common-law right to inquire]; People v Perez, 125 AD2d 419 [2d Dept 1986] [defendant barely fit description provided by anonymous telephone tip, but police could inquire]; People v Catalano, 134 Misc 2d 621 [Sup Ct, NY County 1987] [stop of defendant’s car to inquire was justified based on erroneous radio transmission although defendant’s license plate number differed by one digit from the number originally reported].)
Defendant also argues that, regardless of the age description, the police conduct was unlawful because the 911 caller was anonymous and therefore unreliable (defendant’s mem at 13-14). Indeed, in evaluating probable cause based on hearsay information, the Aguilar-Spinelli test requires a showing that the informant was reliable and had some basis of knowledge of *245 the information furnished. (People v Bigelow, 66 NY2d 417, 423 [1985].) The initial police conduct in this case, however, did not require probable cause. Accordingly, the AguilarSpinelli test is inapplicable here.
Further, relying on Florida v J.L. (529 US 266 [2000]), defendant asserts that “[a]nonymous calls concerning described individuals supposedly in possession of a weapon, do not justify a founded suspicion that criminal activity is afoot with regard to anyone who might fit that description at the described location” (defendant’s mem at 13-14). In Florida v J.L., the Supreme Court held that a “stop and frisk” was illegal where it was conducted on the basis of an anonymous report that there was a man with a gun at a specified location. No “stop and frisk” occurred in this case, and thus the holding of Florida v J.L. is inapplicable. In any case, contrary to defendant’s assertion, anonymous reports can supply the necessary predicate for the common-law right to inquire. (See People v Salaman, 71 NY2d 869 [1988]; People v Stewart, 41 NY2d at 69; People v De Bour, 40 NY2d at 226.) As discussed above, the police action here was appropriate based on the information they received.
Finally, the officers’ questioning of defendant on the scene did not constitute custodial interrogation. (See People v Huffman, 41 NY2d 29 [1976]; People v Brown, 216 AD2d at 3.) The on-the-scene questioning constituted routine investigative inquiries necessary in ascertaining facts. Such general on-the-scene questioning as to facts surrounding a crime or other questioning of citizens in the fact-finding process is exempt from the standards of Miranda. (See Miranda v Arizona, 384 US 436, 481 [1966].) Accordingly, defendant’s statements are admissible at trial.
In sum, based on the radio run they received, the officers appropriately exercised the common-law right to approach and make inquiry of defendant who matched the transmitted description. The fact that the transmission failed to include the reported age of the suspect did not make the officers’ approach and inquiry unlawful. The cocaine was recovered only after defendant abandoned his bag. Defendant’s statements were the result of noncustodial on-the-scene questioning. Accordingly, defendant’s motions to suppress the cocaine and his statements are denied in their entirety.

. With the defendant’s consent, an audio tape recording of the 911 call and the police radio run was admitted into evidence.

. Defendant and the People stipulated that, had the superintendent of the building been called as a defense witness, he would have testified that he was not present at the time of defendant’s arrest and could not testify as to the condition of the building door at that time but that on that date there was a functioning lock and buzzer system.

. Officer Tirado spoke first to defendant in Spanish which defendant answered in Spanish; Officer Hellmer, however, did not understand any of the exchange between the two.