OPINION OF THE COURT
Meyer, J.
 Defendant urges, and the dissenting Judges at the Appellate Division agreed, that his arrest was without probable cause and that, though the police had a reasonable basis upon which to make inquiry, they exceeded constitutional bounds in transporting him from the scene of the inquiry to the scene of the robbery, where he was identified by the victim of the robbery. He contends that identification testimony, both in-court and pretrial, should have been suppressed, as should the revolver found on postarrest station house search of the van he was seated in when first seen by the police. We conclude, however, that there was probable cause for arrest at the time defendant was placed in the police car for transportation to the robbery-scene showup[1] and, therefore, do not reach the question, the basis of the dissent below, when, if ever, a person stopped by the police for inquiry on reasonable suspicion but not probable cause may be transported to the crime scene for possible identification. The order of the Appellate Division should, therefore, be affirmed.
On November 11, 1976 at about 8:00 p.m. a man entered a liquor store in Yonkers and asked for a pint of vodka. The clerk, Frank Mutalipassi, testified that the man was in the store about two minutes, that the man spoke with a slight Slavic, Polish or Russian accent, and that he told the man he had nothing smaller in vodka than a fifth. At 8:30 p.m. the man returned and asked for a fifth of vodka, placing a $20 bill on the counter, but when Mutalipassi obtained the vodka from *370 a shelf at the back of the store and returned to the counter, the man pointed a gun at him and ordered him to lie down on the floor. Mutalipassi was clearing the cash register as the man came in and had left the drawer slightly ajar, but had not removed the bills from it. Lying on the floor, he heard the noise of the spring clips in the register compartments, indicating to him that the money was being removed from it, and the noise of the door to the store opening and closing. After the robber left Mutalipassi noted that the $190 that had been in the register was gone and that the vodka was still on the counter. The elapsed time from beginning to end of the man’s second visit was four to five minutes.
Mutalipassi called the police, and Patrolmen Drexel and Williams arrived within 10 to 15 minutes. Mutalipassi told Drexel that the man was about 5 feet 9 inches with long hair roughly to his collar and light brown in color, with a long thin face and a slight mustache, that he was wearing a long leather-type jacket with a belt and baggy pants of navy blue, and that the gun was black, with a short barrel and short chamber. Williams sought witnesses outside, and was advised by Sandra Thela that she had seen a tan van, possibly rust color too, with two male occupants and bearing out-of-State plates circle the area approximately four times, that it had stopped about 50 yards[2] from the liquor store, and thereafter proceeded south. Drexel broadcast the description of the robber received from Mutalipassi and Williams added, as part of the same broadcast, the description he had received of the van. Williams then went back to Ms. Thela and asked her whether the van was colored like a U-Haul van to which she responded that she believed so since there was writing on the side, that the driver of the van had asked for directions, and that he was a white male, with brown curly hair, a slight mustache and a thin face. Williams then made a second radio broadcast stating that the van could possibly have been a rental van, a U-Haul van. His testimony does not reveal whether the second broadcast included the description of the driver of the van that he had received from Ms. Thela.
The initial broadcast by Drexel and Williams describing the robber and the van was received by Patrolman Molinaro and his partner Patrolman Howe, who had also heard a headquar *371 ters broadcast concerning a "robbery in progress” at the liquor store. While proceeding toward the robbery scene, Molinaro observed a U-Haul van with California license plates parked on Palmer Road, in the front seat of which were two white males. The van was facing in the direction away from the liquor store and was legally parked and Molinaro could see two "white mouths” and dark hair, though not the exact color of the hair of the occupants. Neither he nor his partner heard Williams’ second broadcast[3] since they were both out of the car at the time.
The point at which the van was parked was approximately half to three quarters of a mile from the liquor store. Molinaro and Howe stopped and approached the van from different sides, with drawn guns. Molinaro ordered the occupants out of the van. They got out and Molinaro noted that the driver fit the description given over the air. He frisked them and on inquiring what they were doing in the area was told that they were unfamiliar with the area and were waiting for the return of a friend, who was in the process of dropping off some girls. Molinaro then told them of the liquor store robbery and that they were possible suspects. They were then handcuffed and placed in the police car. After checking the hood of the van and finding it warm and looking cursorily around inside the van, Molinaro locked the van and proceeded in the police car with defendant and his companion and Howe to the scene. Roughly 15 minutes had elapsed from the time of the robbery to defendant’s return with the police to the scene.
Mutalipassi, having looked out the store window to the area where defendant and his companion were standing, stated as to the shorter one (the companion) that he was too short. Asked about the other man, he stated that he could not see his full face through the window. However, when the detective in charge at the scene caused defendant to walk toward the store Mutalipassi immediately identified defendant as the man who held him up, although at the suppression hearing he conceded that the jacket and possibly the pants were not the same as he had originally described.
Molinaro testified that he placed defendant under arrest after being instructed to do so by the detective in charge following Mutalipassi’s identification. The van, taken to police *372 headquarters and there searched without a warrant, yielded up from the space behind its roof cross members a short barreled black steel gun. Search of the van occurred within 15 minutes of defendant’s formal arrest and was regular police procedure with respect to an impounded vehicle.
Evident from the foregoing recital of the facts is it that though Patrolman Molinaro testified that he did not arrest defendant until directed to do so by the detective in charge after Mutalipassi’s identification, defendant was in fact arrested during Molinaro’s first encounter with him, for he was detained under threat of police firearms and by words and acts, which while short of stating that he was being arrested, made it clear that he was not free to leave. At the very least, when handcuffed and placed in the police vehicle for transportation back to the robbery scene, defendant was under arrest (People v Allende, 39 NY2d 474; see People v Cantor, 36 NY2d 106; United States v Brignoni-Ponce, 422 US 873, 878). Equally evident, however, is it that if there was at that point probable cause for arrest there was no constitutional infirmity in either the one-on-one showup at the scene in view of its proximity in time and location to the point of arrest (People v Smith, 38 NY2d 882, 883; People v Blake, 35 NY2d 331, 336-337; People v Logan, 25 NY2d 184, 192; People v Digiosaffate, 63 AD2d 703; People v Jones, 38 AD2d 745), or the inventory search at police headquarters after impoundment of the van that produced the revolver (People v Sullivan, 29 NY2d 69; People v Middleton, 50 AD2d 1040, affd 43 NY2d 703; People v Butler 44 AD2d 423, 429, affd 36 NY2d 990; see La Fave, Search & Seizure § 7.4 [a]; Ann., 48 ALR3d 537).
We conclude that on the facts of this case Molinaro was justified in stopping upon sight of the van, bearing out-of-State license plates, meeting the description as to color he had received, and occupied by two white males, and approaching the occupants with drawn revolver, since the robbery in progress report from headquarters gave him reason to believe that, if this was in fact the van sought, the occupants might be armed. For like reason, he was justified in ordering them out of the van and frisking them. Defendant concedes as much, as indeed he must in light of Terry v Ohio (392 US 1) and CPL 140.40 (subd 3).
 Defendant argues, however, that since no weapon was found on the frisk and the occupants engaged in no questionable behavior when they got out of the van and gave a not *373 unreasonable answer to the inquiry addressed to them concerning why they were in the area, the placing of them in handcuffs in the police car was based on no more than hunch or suspicion. We disagree. The information which Williams had obtained from Ms. Thela established the probable involvement of the occupants of a van of the description she gave in the liquor store robbery. When within 15 minutes after the robbery and within a distance of half to three quarters of a mile from the robbery scene is found a van bearing colors similar to those described in the broadcast, carrying out-of-State plates, and the driver’s seat of which is occupied by a white male with dark hair (thus matching in part the description of the robber received by Molinaro from Drexel’s broadcast), the situation varies but slightly from that held by the Supreme Court to constitute probable cause in Chambers v Maroney (399 US 42, 46-47; cf. People v Allende, 39 NY2d 474, supra; People v Logan, 25 NY2d 184, 193, supra). When to that is added the facts that when defendant alighted from the van it was apparent to Molinaro that he fit the description broadcast by Howe[4] in many more aspects than just the color of his hair and his skin (though not entirely as to clothing) and when on touching the hood of the van it was apparent from its warmth that the van had not been long parked where it was found, there clearly were "facts and circumstances within * * * [Molinaro’s] knowledge and of which * * * [he] had reasonably trustworthy information sufficient in themselves to warrant a man of reasonable caution in the belief that” defendant was the perpetrator of the robbery committed at the liquor store (Brinegar v United States, 338 US 160, 175-176, quoting from Carroll v United States, 267 US 132, 162; *374 see People v Griffin, 29 NY2d 91, 93; People v Weis, 32 AD2d 856, cert den 397 US 1047; People v Maize, 32 AD2d 1031). Since we conclude that Molinaro’s action in returning defendant to the scene was predicated on probable cause, we need not reach the question whether absent such cause it is proper "for the police immediately to return a freshly apprehended suspect to the scene of the crime for identification by one who has seen the culprit minutes before” (Russell v United States, 408 F2d 1280, 1284).
For the foregoing reasons, the order of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
Order affirmed.

. An additional ground for upholding the in-court identification may be found in the Supreme Court’s holdings in United States v Crews (445 US 463); Frisbie v Collins (342 US 519) and Ker v Illinois (119 US 436) under which an in-court identification by a victim who has had sufficient opportunity during a robbery to observe the perpetrator is admissible even though there has also been an out-of-court identification following an unlawful arrest. This is because the victim’s mental image antedates the illegal arrest and if predicated on sufficient opportunity to observe is not tainted by it. Crews recognized that intervening photographic and lineup identifications could sufficiently taint in-court identification to render it inadmissible in some cases. No such circumstances exist in this case, however, for there was sufficient opportunity for observation during and prior to the actual robbery. However, we do not find defendant’s arrest unlawful and, therefore, do not rely upon the CrewsFrisbie-Ker rationale.

. On direct examination Williams said Thela said 50 yards; on cross-examination he said she said 50 feet.

. Howe testified at trial that the second broadcast was with respect to the van being a U-Haul and that he heard it as he and Molinaro were putting defendant and his companion in the police car for transportation to the scene.

. We have not overlooked the reference in the Appellate Division decision to the fact that the second description received by Williams from Thela closely matched that given by Mutalipassi, but place no reliance on it since there is no evidence that it was ever received by Molinaro or that Molinaro acted in arresting defendant and transporting him to the robbery scene on the direction of Williams. The arresting officer acts with probable cause when he arrests on the direction of a fellow officer who has probable cause or without such direction on the basis of information received from a fellow officer who testifies at the suppression hearing concerning how he obtained his knowledge, which information itself or together with that known to the arresting officer establishes probable cause (People v Havelka, 45 NY2d 636; People v Horowitz, 21 NY2d 55; see People v Lypka, 36 NY2d 210; Whiteley v Warden, 401 US 560; La Fave, Search & Seizure, § 3.5 [c]). Here, however, since there was neither transmission of the description nor a direction to arrest, the information cannot be used in determining whether there was probable cause at the time of arrest (La Fave, loc. tit).