Matter of Londell S. (2005 NY Slip Op 50663(U))

[*1]

Matter of Londell S.

2005 NY Slip Op 50663(U)

Decided on May 2, 2005

Family Court, Kings County

Hepner, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 2, 2005

Family Court, Kings County
In the Matter of a Proceeding pursuant to Article III of the Family Court Act Londell S., A Person under the age of sixteen years Alleged to be a Juvenile Delinquent.
xxx

Kirsten E. Heine, Esq., for the Petitioner
Assistant Corporation Counsel
NYC Law Department
350 Jay Street
Brooklyn, New York 11201
Laura Potter Cahn, Esq., for the Respondent
Legal Aid Society
111 Livingston Street
Brooklyn, New York 11201

Paula J. Hepner, J.
Counsel for the Respondent filed an omnibus motion pursuant to Sections 330.2, 332.1(7), 332.2 of the Family Court Act [hereinafter cited as "FCA"] seeking suppression of property recovered pursuant to Dunaway v New York (442 US 200 [1979]) and Mapp v Ohio (367 US 643 [1961]) on the grounds that the stop, seizure, search and arrest of the Respondent [*2]was without probable cause.[FN1] Because the police officers did not have probable cause to arrest the Respondent or reasonable suspicion to detain him, he asserts that any property recovered should be suppressed as a fruit of the poisonous tree (Wong Sun v United States, 371 US 471 [1963]; People v Rossi, 80 NY2d 952 [1992], rearg denied 81 NY2d 835 [1993]).
 Police Officer Rashida Jupiter was the sole witness to testify on behalf of the Presentment Agency. The Respondent called Assistant District Attorney Vinoo Varghesse as his sole witness. The Presentment Agency offered into evidence two documents -Procedure No 218-13 from the NYPD Patrol Guide and a copy of the Property Clerk's Motor Vehicle Invoice. The Respondent did not offer any documentary evidence but did ask the Court to take judicial notice of page fifty-eight from the driver's manual issued by the NYS Department of Motor Vehicles, Sections 1211 [FN2] and 1202 [FN3] of the NYS Vehicle and Traffic Law.
The Respondent contends that the firearm discovered during the inventory search should be suppressed as a fruit of the poisonous tree because there was no probable cause to approach the vehicle and effect a car stop. Even if the driver had committed a traffic violation, Respondent maintains that any such
infractions could not be imputed to a passenger in the vehicle. Without any basis to believe the Respondent was involved in a larceny or unauthorized use, there was no basis to detain the Respondent and he was free to leave. Respondent further contends that the firearm should be suppressed as its discovery was the product of an unlawful inventory search of the car that took place after the car was illegally impounded. Finally, Respondent contends that Officer Jupiter's testimony is wholly incredible since she changed her testimony repeatedly about the movements of the car, testified inconsistently about the production of the rental agreement, contradicted herself about the sequence of events and was confused about which of her fellow officers did what.
The Presentment Agency opposes suppression of the firearm arguing the initial encounter was not a "car stop" despite Officer Jupiter's characterization of it as such because the car was not in motion when the officers approached. Not being a "car stop," the prosecution maintains a lesser degree of inquiry was needed. When the Respondent opened the door and began to flee, the permissible level of intrusion was elevated since the Respondent's attempt to leave evinced a "consciousness of guilt." The Presentment Agency contends the Respondent was "only free to leave if he sat in the car" and since he was a passenger, had he done that, he would have been released. Arguing the Respondent committed a criminal act when he banged into Officer Jupiter, the prosecution maintains he was lawfully arrested. In regard to the search of the vehicle, the [*3]Presentment Agency argues the search was lawful since the Respondent does not have standing to contest the search and, even if he did, he waived that right when he abandoned the car. Finally, the Presentment Agency argues the firearm should not be suppressed since it would have been recovered whether or not the Respondent remained in the car or fled because the vehicle was searched and towed in accordance with standard police procedures set forth in the Patrol Guide.
Decision was reserved in order to give the Court an opportunity to reflect upon the testimony and consider the points and authorities raised by counsel in their summations.
FINDINGS OF FACT
The Court has had the unique opportunity to hear the testimony of the witnesses, observe their demeanor, and assess their veracity. Based on the material, relevant and credible evidence adduced, the Court makes the following findings based upon the facts established at the hearing.
Police Officer Rashida Jupiter testified that she was assigned a tour of duty from 5:30 p.m. on July 4, 2003 to 2:05 a.m. on July 5, 2003 to drive around her supervisors Lieutenant McCray and Sergeant Murphy. They were all dressed in plainclothes and riding in an unmarked car. Officer Jupiter was wearing her shield on her neck and the "color of the day" on her wrist. At 1:30 a.m on July 5, 2003 she was driving down East 93rd Street toward the corner of Winthrop when she saw a two door Chrysler "pull into a spot, pull out of a spot, back up the street, pull back up the street and then pull into another spot in front of a hydrant"[FN4] on the other side of street.
East 93rd Street is a one way street consisting of one traffic lane and two lanes for parked cars on both sides of the street. At the time she observed the Chrysler pull back into the first spot on the left hand side of the street, she was two car lengths behind it. According to Officer Jupiter, the Chrysler then "pulled out of that spot and went to another spot on the right hand side where a hydrant is." Officer Jupiter decided to make a "car stop" in order to "make sure nothing was wrong with the vehicle because it was parked in front of a hydrant" and she felt, as well, that "it was a reckless procedure because it was just coming back and he could have hit us going back, going forward and then pull[ing] into a spot."
To effect the stop, Officer Jupiter pulled in behind the car, put on her vehicle's lights, beeped the siren to let them know it was police behind them and exited from her car. The other two officers also got out of the car. In her testimony, Officer Jupiter said that Lieutenant McCray approached on the driver's side of the vehicle while she went to the passenger side along with Sergeant Murphy.[FN5] Officer Jupiter indicated she was not able to see what the officer on the driver's side of the car was doing. While she did not have her service weapon drawn, she was unable to see if either the lieutenant or the sergeant did.
None of the officers gave any orders directing the passenger to stay in or get out of the car or to keep his hands in view. None of the officers spoke to the passenger. When Officer Jupiter was by the rear panel about two feet from the passenger door, the passenger car door opened up and the Respondent "ran out, pushed [Officer Jupiter] out of the way" causing her to stumble [*4]back-wards. She grabbed for him and a struggle ensued. Another officer came and tried to help her out. The Respondent, who was "still struggling, his arms punching and swinging," fell on top of Officer Jupiter's foot. The Respondent was handcuffed and arrested.
The driver of the vehicle produced identification and a search of the car was conducted by Officer Jupiter "because we didn't know what was inside the vehicle and what was going on with this vehicle. We wanted to find out who the vehicle belonged to because the driver of the vehicle had no paperwork." A rental agreement was found inside the vehicle during an inventory search conducted by Officer Jupiter but she did not recall "exactly where." The driver of the Chrysler was arrested for unauthorized use because "he wasn't authorized to have this vehicle" as his name [was] nowhere on [the rental] agreement" and no additional drivers were listed on it.
This conclusion was based on an assumption since the officers took no affirmative steps to determine that this was so. The rental agreement contained both the name of the person who leased the Chrysler and a phone number for the rental agency. While Officer Jupiter said they attempted to find out who the owner was, she conceded on cross-examination that no attempt was made to contact the individual who rented the car. She testified a call was placed to the rental agency but the office was closed and an answering machine came on.
During the inventory search conducted at the scene, Officer Jupiter discovered a firearm on the driver's side underneath the seat. She completed a Property Clerk's Motor Vehicle Invoice.[FN6] She did not find a key with the car and none was in the ignition. When the driver and the Respondent were searched, no key for the car was found. No damage to the vehicle was visible.
The driver was not given any tickets at the scene for any moving violations or driving without a license and when the criminal complaint was drafted, ADA Varghese did not charge the driver with any violations of the Vehicle and Traffic Law.
CONCLUSIONS OF LAW
The Court, having reviewed the applicable judicial pre-cedents pertaining to the suppression issues at bar and having considered the arguments, points and authorities cited by counsel in their summations, now makes the following conclusions of law based upon the relevant facts established at the hearing.
A. Standing
Of relevance to this motion, the petition charges the Respondent with two counts of Criminal Possession of a Weapon in the 3rd Degree, violations of Penal Law §265.02(3) and (4) [hereinafter cited as "PL"], Criminal Possession of a Weapon in the 4th Degree, a violation of PL 265.01(1), and two counts of Unlawful Possession of Weapons by a Person Under Sixteen, violations of PL §265.05. Since the Respondent was a passenger in the vehicle and the firearm was found underneath the driver's seat, prosecution under these sections relies on the statutory presumptions of possession and unlawful intent contained in PL §265.15.
Passengers in a vehicle have standing to challenge the admissibility of physical evidence obtained following an illegal stop (In re Muhammad F., 94 NY2d 136 [1999]; People v Millan, 69 NY2d 514 [1987]; People v Delvas, 164 AD2d 940 [2d Dept. 1990]; People v Dawson, 115 AD2d 611 [2d Dept. 1985]). Following a lawful stop, a passenger cannot challenge the [*5]admissibility of physical evidence obtained during a search of the vehicle unless s/he is charged under the statutory presumptions in the penal law with possessing weapons or drugs (In re Karif B., 301 AD2d 520 [2d Dept. 2003]; People v King, 242 AD2d 736 [2d Dept. 1997]; People v Hicks, 138 AD2d 519 [2d Dept. 1988]). On the facts of this case, the Respondent has met the standing requirements to challenge the admissibility of the property whether the stop was illegal or lawful.
In the interests of public safety and as part of its "com-munity caretaking functions" the police have the authority to take automobiles into police custody (Cady v Dombrowski, 413 US 433, 441 [1973]). In South Dakota v Opperman (428 US 364 [1976]) the Supreme Court ruled that the police may search a lawfully impounded vehicle to inventory its contents. However, when an inventory search is conducted after an illegal arrest (People v Brnja, 50 NY2d 366 [1980]; People v Walker, 129 AD2d 751 [2d Dept. 1987]; People v Delhall, 131 AD2d 870 [2d Dept. 1987]) or an illegal impoundment (People v Miles, 3 Misc 3d 566, [Rochester City Ct. 2003]) it is invalid. Since the physical evidence at issue in this case was discovered during an inventory search, its admissibility depends on the lawfulness of the impoundment which derives from the legality of the underlying arrest. Since the Respondent has standing to challenge the admissibility of the property based on the lawfulness of the arrest in the first instance, he also has standing to challenge the admissibility of the property based on the lawfulness of the impoundment and the inventory search.
B. Probable Cause & Inevitable Discovery
In a hearing to suppress physical evidence under Mapp v Ohio (367 US 643 [1961]), the Presentment Agency has the burden of going forward to show the evidence it seeks to introduce was acquired in a legal manner (People v Baldwin, 25 NY2d 66, 70 [1969]; People v Malinsky, 15 NY2d 86, 91 [1965]). Once the Presentment Agency makes such a showing, the burden shifts to the Respondent who must prove, by a preponderance of the evidence, that the police action violated the individual's constitutional rights and, therefore, the evidence should not be used against him (People v Berrios, 28 NY2d 361, 367 [1971]).
In going forward at a Dunaway hearing, the Presentment Agency must establish probable cause for the Respondent's arrest or detention beyond a reasonable doubt. Even if the prosecution is unable to meet this burden, "in challenging the admission of the evidence, the defendant has the burden of showing that the seizure of the evidence was causally related to the illegal police conduct" (People v Arnau, 58 NY2d 27, 32 [1982], cert denied 468 US 1217 [1982]) because "[i]t has never been enough to show that evidence must be suppressed simply because it was dis-covered subsequent to an illegal arrest" (People v Rogers, 52 NY2d 527, 535 [1981] cert denied 454 US 898 [1981]). Only evidence which "has been come at by exploitation of that illegality" will be suppressed by the application of the exclusionary rule (Wong Sun, 371 US at 488). If, however, the defendant can show that the physical evidence to be offered was obtained as a direct result of impermissible police conduct, the Court of Appeals described two "situations in which the detrimental impact of the illegal police action on the challenged evidence becomes so minute as to no longer justify the penalty of suppression under the exclusionary rule" (Rogers, 52 NY2d at 533). Those situations are: "where the evidence challenged was the product of a source independent of the defendant's detention, and where the discovery of the challenged evidence was attenuated from the illegal activity by a significant intervening event which justified the [*6]conclusion that that evidence was not the product of the illegal activity" Id. In People v Gethers (86 NY2d 159, 162 [1995]) the Court of Appeals included "inevitable discovery" as a third exception.[FN7]
In People v Cantor (36 NY2d 106, 112 [1975]), the Court of Appeals held that before a person may be stopped, the police must have a reasonable suspicion that the person is committing, has committed or is about to commit a crime. "Reasonable suspicion" was defined by the Court as "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious person, under the circumstances, to believe criminal activity is at hand" (People v Martinez, 80 NY2d 444, 448 [1992]). The Court went on to say that in order "to justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion" (Martinez, 80 NY2d at 448). Reasonable suspicion will not be justified by a vague or unparticularized hunch (People v Sobotker, 43 NY2d 559, 564 [1978]), and neither will "equivocal or innocuous behavior" that is susceptible of an innocent as well as culpable interpretation generate a founded suspicion that criminal activity is afoot (People v Carrasquillo, 54 NY2d 248, 252 [1981]). Once reasonable suspicion is established, the Court must determine whether the police action was justified at its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible (Terry v Ohio, 392 US 1, 19 [1968]). The facts and circumstances unique to each particular case will determine whether the police action was reasonable. In the year following Cantor, these principles were incorporated by the Court of Appeals into the standards established in People v DeBour (40 NY2d 210 [1976]), for courts to use in considering whether or not a particular police action is reasonably related in scope to the circumstances which triggered it.[FN8]
These principles are applicable to the stop of an automobile which constitutes a seizure [*7]under the Fourth Amendment (Delaware v Prouse, 440 US 648 [1979]). Interference with a moving vehicle is a seizure requiring reasonable suspicion (People v May, 81 NY2d 725, 727 [1992]).[FN9] In contrast, a lesser standard has been applied when the police approach a parked car. They may approach with an objective, credible reason (People v Harrison, 57 NY2d 470 [1982]).[FN10] This is so because the Court recognized "such an inquiry involved a minimal intrusion that is not equivalent to a stop in which the individual's freedom of movement is signifi-cantly interrupted" (People v Harrison, 57 NY2d at 475-476). In cases where a car is neither parked nor moving, the standard to be applied is "whether a reasonable person would have believed, under the circumstances, that the officer's conduct was a significant limitation on his or her freedom" (People v Ocasio, 85 NY2d 982, 984 [1995]). In assessing whether a seizure has occurred, courts must look to the manner in which the police approached the car  "was there a chase; were lights, sirens or a loudspeaker used; was the officer's gun drawn, was the individual prevented from moving; how many verbal commands were given; what was the content and tone of the commands; how many officers were involved; where did the encounter take place" (People v Bora, 83 NY2d 531 [1994]).
Whether the police action involved a seizure of a moving vehicle requiring reasonable suspicion under May, or an approach to a stationary or parked car under Harrison, is a question of fact. In this case, when the police approached this Chrysler, it was stationary and temporarily standing in front of a fire hydrant after stopping voluntarily and independent of any police action. The officers drove up behind the Chrysler with their car's lights on and the driver beeped the siren. All three officers got out of the unmarked police car; two walked toward the passenger's exit and one walked up to the driver's exit. Since this was a two door car, all egress to the vehicle was blocked. While this scenario contains some elements that might cause a reasonable person to believe his/her freedom of movement was "significantly limited," the Respondent did not believe that. He was able to get out of the vehicle and exercise his right to be let alone. There does not appear to be a basis for concluding a seizure occurred in this case.
 Thus the analysis of the facts of this case begins with what level of police interference, if any, was permissible under DeBour based on watching the Chrysler back down 93rd Street a distance of two car lengths and parallel park in an empty space, then pull forward a distance of four car lengths, and then go in reverse for the same distance to parallel park in front of a hydrant across the street. The driver of the Chrysler did nothing more than perform a maneuver typically carried out on the streets of New York City by motorists desperate to snare the elusive parking space or find a place to temporarily stop and stand without blocking the flow of traffic. Without more, the police were confined to an approach to request information. At 1:30 a.m. in the morning after the Fourth of July celebration and thirty minutes before the end of their tour, Officer Jupiter and the other officers acted on a "vague or unparticularized hunch" because what [*8]they observed was simply "equivocal or innocuous behavior."
In determining whether an "objective credible reason" existed for approaching a stationary or parked vehicle, "all that is required is that the stop not be the product of mere whim, caprice, or idle curiosity" (People v Ingle, 36 NY2d 413, 418 [1975]; People v Allende, 39 NY2d 474 [1976]; People v Lanahan, 89 AD2d 629-630 [3rd Dept. 1982]).[FN11] There is case law holding that an officer may approach a stationary car to inquire if the occupants need assistance or are in any danger because this is a legitimate public service function of the police (People v Pegues, 208 AD2d 773 [2d Dept. 1994]; People v Jaime, 171 AD2d 884 [2d Dept. 1991]). Where a person is found sitting at the wheel of a car blocking a fire hydrant, under the Vehicle and Traffic Law, the police are entitled to approach and ask the person to move the car or to ask basic information for the purpose of determining whether the car's presence beside the hydrant is lawful, which it would be if the person at the wheel is a licensed driver or, alternatively, unlawful, if the person at the wheel is not a licensed driver (People v Thomas, WL 851218 (N.Y.A.D. 1 Dept., 2005).[FN12] Officer Jupiter attempted to justify her actions by saying she wanted to "make sure nothing was wrong with the vehicle" as the driver had just executed a "reckless procedure." After admitting on cross-examination, however, that at the time the Chrysler backed up about twenty-five feet and pulled into the first spot to parallel park, "it was backing up safely," Officer Jupiter could not convincingly maintain that she had an objective credible reason for the interference.
Inasmuch as there was: (a) no testimony the Chrysler was improperly outfitted for road travel because of a missing license plate, inoperative taillights, or a cracked windshield; (b) no testimony that the Chrysler bore any external signs of forced entry or internal damage typically seen on cars that have been [*9]stolen such as broken steering column; (c) no testimony showing the police observed the driver commit a traffic infrac-tion, observed a driver who appeared to be underage or observed either the driver or passenger acting in a furtive and suspicious manner; (d) no testimony indicating the police ran the license plate number on a mobile digital terminal in the police car and learned the Chrysler was stolen, or noticed an expired regis-tration or missing inspection sticker on the windshield, and (e) no testimony that the driver was issued tickets at the scene by any of the officers for a moving violation or driving without a valid license or, when the criminal complaint was drafted, charged by ADA Varghese with any violations of the Vehicle and Traffic Law, there was no basis to detain the occupants any longer than that needed to establish the driver and passenger were neither in danger nor in need of help. Nothing subsequently transpiring at the scene to give the police permission to go beyond a Level I request for information under DeBour.
On the evidence in the record, the police had no authority to interfere with the Respondent, who was a passenger in the car, as there is no testimony showing the Respondent engaged in any conduct which would pose a risk to the safety of the officers. Once the car was stopped, the Respondent was free to leave, as Officer Jupiter conceded (People v Robbins, 83 NY2d 928 [1994]). The officers had no to basis to grab and detain the Respondent simply because he pushed Officer Jupiter as he was hastily departing from the vehicle in exercise of this right. These facts did not afford the police a basis to believe the Respondent was committing, had committed or was about to commit a crime (People v Antelmi, 196 AD2d 658 [2d Dept. 1993]).
C. Impoundment
In New York, a car may be impounded for a number of reasons including the fact that it is being driven by a person with no valid license and there is no one else present who can legally drive it (People v Figueroa, 6 AD3d 720 [2d Dept. 2004], appeal dism 3 NY3d 640[2004]; a car is unregistered, uninsured or uninspected (People v Marasa, 284 AD2d 971 [4th Dept. 2001], lv denied 96 NY2d 940 [2001]); or a car is abandoned (People v Hanks, 275 AD2d 1008 [4th Dept. 2000], lv denied 95 NY2d 964 [2000]).
Assessment of the decision to impound a vehicle involves two factors: the lawfulness of the arrest, the totality of the circumstances involving the vehicle including its condition, location at the time of the arrest and the presence of other persons to whom the driver may wish to entrust it (People v Miles, 3 Misc 3d 566 [City Ct. Rochester 2003]). Testing the decision of the officers to impound the Chrysler in this case, the record does not support the police action by any of these measures. To begin with, the arrest of the driver for unauthor-ized use was unlawful since the driver committed no traffic infraction, was not driving without a valid driver's license, and had all the necessary paperwork to show the car could be operated legally on the road because it was properly registered, inspected and insured and had license plates. In light of their failure to establish that the car was actually stolen or that it was being operated without the lessee's permission, the police had no probable cause to arrest the driver or the Respondent.
Second, looking at the totality of the circumstances of the vehicle, Officer Jupiter's testimony that the car had to be vouchered and towed for investigatory purposes ostensibly because "at the scene [they] didn't know who owned the vehicle" is patently incredible. It is [*10]conceded that the police knew which car rental company owned the Chrysler and knew who had rented the car and was responsible for it. Since the owner of the car was known and the identity of the lessee was known, the only premise advanced by Officer Jupiter for impounding the vehicle was satisfied with the production of the rental agreement. Since neither the name of the driver or the passenger was listed in the rental agreement, the officers had no legal basis for taking possession of the car until they contacted the lessee of the vehicle and determined what the status of the rental vehicle was (People v Grear, 232 AD2d 578 [2d Dept. 1996], appeal den 89 NY2d 923 [1996]). While the Supreme Court has held that the police are not required to seek alternatives to impoundment in order to satisfy the Fourth Amendment (Colorado v Bertine, 479 US 367 [1987]); People v Turner,91 AD2d 646 [2d Dept. 1982]), that does not relieve them of the burden to show that impoundment was proper in the first instance.
Officer Jupiter's testimony about when and how the rental agreement surfaced is equally untrustworthy. First she said there was "a rental agreement inside the car." When asked if the driver provided the police with the agreement [FN13], she denied that and said that she "found [it] during the inventory search" which she said was done after the driver was arrested. This is inconsistent with her earlier testimony in which she said the driver produced identification for himself and when the officers realized his name was not listed on the rental agreement, they arrested him for unauthorized use of a vehicle. If the inventory search followed the driver's arrest, as Officer Jupiter testified, the rental agreement had to have been located before the inventory search since the driver was arrested based on the discrepancy between his ID and the lessee's name on the rental agreement. For all of these reasons the decision to impound the vehicle was unlawful.
D. Inventory Search
The holding of South Dakota v Opperman was adopted in New York in People v Gonzalez (62 NY2d 386 [1984]) where the Court of Appeals held that the police are authorized to conduct inventory searches of vehicles that are lawfully within their custody. Because an inventory search is described as a routine adminis-trative function, the justification for an inventory search rests on the reasonableness of the police procedures which authorize it rather than on the existence of probable cause to make the arrest (Illinois v LaFayette, 462 US 640 [1983]; Gonzalez, 62 NY2d at 389).
An inventory search is "designed to properly catalogue the contents of the item searched" and it's purpose is "to protect the property of the defendant, to protect the police against any claim of lost property, and to protect police personnel and others from any dangerous instruments (Florida v Wells, 495 US 1, 4 [1990]). As the Supreme Court said in Wells, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence"(Id.) In order to "guard against this danger, an inventory search should be conducted pursuant to 'an established procedure clearly limiting the conduct of individual officers that assures that the searches are carried out consistently and reasonably'" (People v Galak, 80 NY2d 715, 719 [1993]). The procedure must be standardized so as to "limit the discretion of the officer in the field" (Id.). The purpose of an inventory search is not to acquire incriminating evidence
[*11](People v Johnson, 1 NY3d 252, 256 [2003]).
An inventory search must be conducted according to a familiar routine procedure (Colorado v Bertine, 479 US 371, 375 [1987]) and the procedure must meet two standards of reasonable-ness. The validity of inventory searches is to be measured by two criteria: whether the procedure is rationally designed to meet the objectives that justify the search, and whether the pro-cedures limit the discretion of the officer to decide which items are seized, which are kept in the vehicle and which are returned to the owner (People v Galak, 80 NY2d at 721). It is the prose-cution's burden to show that the inventory search was conducted pursuant to a standard local police procedure and that the search was conducted according to its guidelines (People v Johnson, 1 NY3d 252 [2003]). Elements factoring into a determination of whether the inventory search was reasonable are the scope of the search and the timing of the search.
Procedure No. 218-13 from the NYPD Patrol Guide is titled "Inventory Searches of Automobiles and Other Property."[FN14] Its stated purpose is "to protect property, ensure against unwar-ranted claims of theft, and protect uniformed members of the service and others against dangerous instrumentalities." The procedure states that "whenever any property comes in the custody of this Department [NYPD] an inventory search will be conducted as follows." It is directed to "uniformed members of the ser-vice." The procedure instructs officers to "search the interior of the vehicle thoroughly" and specifies ten areas of the vehicle that "should" be included. The trunk and glove compartment are among them. The procedure references two forms and reports ("Property Clerk Invoice" and "Activity Log") but contains no directive in regard to completing them. "The policy or practice governing inventory searches should be designed to produce an inventory" (People v Johnson, 1 NY3d at 256-257 citing Wells, 495 US at 4 and Galak, 80 NY2d at 720).
The Property Clerk's Motor Vehicle Invoice completed by Officer Jupiter lists the name of the registered owner as Dollar Rent a Car. The car was listed as having 4 tires, 2 airbags, a battery and an AM/FM radio. No additional equipment or acces-sories were listed on the form. No missing or damaged parts were listed on the form. No contents of the vehicle were listed. This is not a usable inventory. The only area of the car that appears to have been opened and searched was the glove compartment. The trunk was described as locked. The car's exterior and interior condition were both described as "good." Under "additional details" Officer Jupiter filled in that the "vehicle is being voucherd (sic) for an abandon (sic) vehicle" though it clearly was not.
In regard to the scope of the inventory search performed by Officer Jupiter, she did not indicate on the form that she searched the console, the map pockets on the doors, under the floor mats, under and behind the dashboard, inside the ashtrays, in the air vents, or under the hood. Officer Jupiter did not comply with Procedure 218-13 since it can hardly be said that she conducted a thorough search by simply looking in the glove com-partment and under the driver's seat (People v Johnson, 1 NY3d at 256).
In regard to the timing of the search, the paperwork con-tains the time 0230 which would have been one hour after Officer Jupiter initially observed the Chrysler's maneuver. There is no testimony in the record about the time the search was actually conducted. Officer Jupiter was [*12]never asked whether the time recorded on the invoice reflects the time the paperwork was completed at the precinct or the time the search was done. Because the inventory search failed to conform to NYPD's stand-ardized procedures, and because it was not performed subsequent to a lawful arrest, the firearm found in the process is not admissible under the inevitable discovery doctrine. DECISION
The Presentment Agency has not met its burden of going forward to show beyond a reasonable doubt there was probable cause for the Respondent's arrest or detention. The Respondent has met his burden to show, by a preponderance of the evidence, that the physical evidence was not acquired in a legal manner, that his Fourth Amendment rights were violated and that the physical evidence should be suppressed because it was obtained through "exploitation of that illegality." Accordingly, the Respondent's motion to suppress the property recovered is granted pursuant to Dunaway v New York, Mapp v Ohio and Wong Sun v United States.
E N T E R :
 
 PAULA J. HEPNER, J.F.C.
Footnotes

Footnote 1: In Matter of Ronald C., 107 AD2d 1053 [4th Dept. 1985], the Appellate Division applied the holding of People v Dunaway to juvenile delinquency proceedings. 

Footnote 2: McKinney's Vehicle and Traffic Law § 1211(a) Limitations on backing provides that "The driver of a vehicle shall not back the same unless such movement can be made with safety and without interfering with other traffic."

Footnote 3: McKinney's Vehicle and Traffic Law § 1202(b) provides that "No person shall stop, stand or park a vehicle within fifteen feet of a fire hydrant except when such vehicle is attended by a licensed operator or chauffeur who is seated in the front seat and who can immediately move such vehicle in case of emergency, unless a different distance is indicated by official signs, markings or parking meters."

Footnote 4: Citations for the quotations excerpted from the transcripts of the testimony have been omitted for purposes of publication.

Footnote 5: ADA Varghese testified she told him Sergeant Murphy approached on the driver's side of the car and interacted with the driver. 

Footnote 6: Petitioner's Exhibit #2 in evidence.

Footnote 7: Under the inevitable discovery exception, "evidence obtained as a result of information derived from an unlawful search or other illegal police conduct is not admissible under the fruit of the poisonous tree doctrine where the normal course of police investigation would, in any case, even absent the illicit conduct, have inevitably led to such evidence" (People v Fitzpatrick, 32 NY2d 499, 506 [1973]. To rely on this doctrine it is incumbent upon the prosecution to demonstrate "a very high degree of probability, that the evidence in question would have been obtained independently of the tainted source"(People v Payton, 45 NY2d 300, 313 [1978]rev'd on other grounds, 445 US 573, on remand, 51 NY2d 169 [1980]; People v Turriago, 90 NY2d 77, 86 [1997]). 

Footnote 8: In DeBour, the Court of Appeals identified four levels of police intrusion and set forth the factors to justify each: (a) approach to request information/requires some objective credible reason for the interference; (b) common law right to inquire (short of forcible seizure)/requires a founded suspicion that criminal activity is afoot; (c) forcible stop and detention (and limited pat-down frisk if there is a suspicion that the person is armed)/requires reasonable suspicion that a particular person has committed, is committing or is about to commit a crime; (d) arrest/requires probable cause to believe the person committed a crime. "Each progressive level, however, authorizes a separate degree of police interference with the liberty of the person approached and consequently requires escalating suspicion on the part of the investigating officer" (People v Hollman, 79 NY2d 181, 185 [1992]; People v Spencer, 193 AD2d 90 [2d Dept. 1993], appeal granted 82 NY2d 931[1994], revd 84 NY2d 749 [1995], cert denied New York v Spencer, 516 US 905 [1995]). 

Footnote 9: In May the vehicle was in traffic but stationary while stopped for a traffic light. The police, using red turret lights, a spotlight and a loudspeaker, ordered the defendant to pull the car over. The Court held this to be a seizure.

Footnote 10: In Harrison the driver in a parked car had opened the door and was proceeding to get out of the car when the officer told him to get back in the car. The officer also directed another passenger to sit up. Both men complied with these directions. The Court held that confining the occupants to the car, even if only temporarily, is at least equivalent to a stop. 

Footnote 11: In Ingle, the defendant was not speeding, nor operating his vehicle in violation of any other traffic law. A State Trooper, having no informa-tion concerning the defendant or his vehicle, decided to make a "routine traffic check." Using his red signal lights and flasher, the officer caused the defendant to pull over to the side of the road. In Allende defendant's vehicle was double-parked and the engine was running. The police approached on both sides of the car with their guns drawn. Before making the stop, the police did not receive any bulletins about criminal activity involving this car, one similar to it, or suspects resembling the defendant. In Lanahan, the officer responded to a radio call concerning suspicious conduct by the occupants of a vehicle and followed the only car he found on Hunting Road until it was parked by the driver's own volition in a driveway. He did not use his flashing lights, siren or horn.

Footnote 12: In People v Thomas (WL 851218 [NYAD 1 Dept., 2005]) the defendant was sitting in the driver's seat in a car that was parked adjacent to a hydrant with it's engine running. An officer drove up and parked his van "directly in front of" the defendant's car. The Appellate Division held that "a car standing at a fire hydrant presents a special circumstance, however, in that any reasonable person would understand that, for obvious reasons of public safety, stopping one's car beside a hydrant invites the attention of law enforcement. By thus implicitly inviting police attention, a person stopping a car beside a hydrant attenuates his or her privacy interest to the extent that it becomes appropriate for the police, upon approaching in order to direct the removal of the car, to make limited inquiries to ascertain that such person is a licensed driver." The Appellate Division also concluded that the police interference does not "constitute a level III 'forcible stop and detention' [requiring reasonable suspicion] under DeBour even if the police stop their vehicle in a position that incidentally blocks the civilian vehicle's path" where the evidence does not show that "the police deliberately stopped their vehicle in a position that would block the path of defendant's vehicle." 

Footnote 13: This testimony conflicts with ADA Varghese who recorded in his paperwork that Officer Jupiter told him Sergeant Murphy spoke to the driver and he handed the rental agreement to the sergeant.

Footnote 14: Petitioner's Exhibit #1 in evidence.