Abdus-Salaam, J.
(concurring). In considering the legality of police searches and seizures instigated by hearsay information under article I, § 12 of the Constitution of the State of New York, we have adhered to the Supreme Court’s mid-twentieth-century jurisprudence on hearsay tips as laid out in Aguilar v Texas (378 US 108 [1964]) and Spinelli v United States (393 US 410 [1969]). Thus, we have held that hearsay information cannot provide a police officer with probable cause to arrest an individual unless the hearsay report reveals a reliable basis for the informant’s knowledge and shows that the informant is generally credible (see People v Johnson, 66 NY2d 398, 406-407 [1985]). In holding that, under any relevant legal standard, the tip in People v Argyris and People v DiSalvo bears legally sufficient indicia of reliability and the tip in People v Johnson does not (see majority mem at 1140-1141), the Court does not retreat from this state constitutional tradition, and therefore I join the Court’s memorandum opinion in full.
I write separately to suggest further guidance on the legal standards that, in my opinion, should apply to the determina *1144 tion of the legality of investigatory stops precipitated by anonymous hearsay tips. In my view, courts should apply the AguilarSpinelli standard to determine the legality of investigatory stops precipitated by anonymous hearsay tips. Accordingly, I would hold that the police cannot physically seize an individual based solely on an anonymous hearsay tip, regardless of whether they seek to effect an arrest or a brief investigatory stop, unless the tip satisfies the veracity and basis-of-knowledge prongs of the Aguilar-Spinelli test. Furthermore, I would conclude that the determination of whether a tip provides the police with probable cause or reasonable suspicion depends on the quality of the tip’s description of the crime itself, as opposed to its statements regarding the suspect’s physical appearance and non-criminal conduct.
I
People v Argyris and People v DiSalvo
At about 2:15 p.m. on July 19, 2007, an unidentified man called 911. The man told the 911 operator that he was near a building at New Town Avenue and 31st Street in Astoria, Queens, and that, as he had come out of the building, he had seen someone with a gun. Specifically, the man said, “I saw a black mustang, brand new black mustang with like four guys and I saw one of them put in a big gun in the back of the car.” The caller reported the license plate number of the black Mustang. The caller told the operator that the car had “just [gone]” down the block to 28th Street and then turned right onto that street heading toward Astoria Boulevard. According to the caller, a grey van had been accompanying the car. When the operator interrupted the caller and asked whether he wanted to provide his name and telephone number, the caller replied, “No I don’t really want to, I just saw something and I say something like they say.”
When questioned about the men’s appearance, the caller said that they were “tall big bully white guys.” The operator inquired about the men’s clothing, and the caller said that he did not know what they were wearing. He did state, “I’m sorry . . . well, when the guy was putting the gun on the back of the car that I saw him [sic] ... so I just made, I play stupid and I went right into my car.” The operator asked whether the caller would wait for the police to arrive, and he responded, “Well, uh, do you want me to wait around for them?” The operator stated, “It’s up to you.” The caller said, “I don’t really have to,” adding, “OK?” The operator replied, “Alright,” and the call ended. The entire 911 call was recorded.
*1145 A few minutes later, several New York City police officers on vehicular patrol in separate cars, including Sergeant Louis Bauso, Officer Michael Castelli and Officer Kashim Valles, received a radio run reporting the details contained in the 911 call. Bauso drove to the area described in the call and looked for the black Mustang, but he did not find it. At around 2:30 p.m., Castelli spotted a black Mustang and a grey van on 31st Street. The Mustang had the license plate number reported by the 911 caller. Castelli and his partner decided to follow the vehicles, and Castelli’s partner sent a radio transmission stating that they were doing so. The record on appeal does not reveal whether any of the other officers received Castelli’s partner’s radio run.
Around that time, Sergeant Bauso saw the Mustang and the van at a traffic light, and he pulled over at a bus stop and got out of his car to get a better look at the license plate number on the Mustang. After seeing that the license plate number matched the 911 caller’s description of it, Bauso allegedly pointed at the Mustang and called out, “Pull over.” The Mustang continued driving, and at a nearby intersection at 31st Street, the Mustang and the van went in separate directions. Bauso got back in his car and pursued the Mustang.
Meanwhile, Officer Valles saw the Mustang drive toward him and then turn onto 31st Street. Valles drove after the Mustang, and soon thereafter, he stopped it by using his car to cut it off. Valles called for backup, and he got out of his car and pointed his gun at the Mustang. Sergeant Bauso, his partner and about six other officers arrived, and as the backup officers trained their guns on the Mustang, Valles holstered his weapon and directed the occupants of the Mustang to exit the car.
Defendant John DiSalvo exited from the front passenger seat of the Mustang, and Officer Valles observed that DiSalvo had a gun in his waistband. Valles ordered DiSalvo to put his hands on the Mustang, and after DiSalvo complied, Valles handcuffed DiSalvo and searched him, recovering the gun and some cash. Valles then continued to order the occupants of the Mustang to exit one by one, and he handcuffed and searched each one. After the driver was searched, defendant Costandino Argyris emerged from the backseat wearing a bulletproof vest, which was visible underneath his sweatshirt. When Valles searched Argyris, he recovered a metal and leather club, as well as a switchblade, from Argyris’s person. Upon searching the car, Valles found a *1146 loaded .38 caliber handgun under the driver’s seat and a box of 9 millimeter ammunition on the backseat.[1]
Following their indictment on various weapons-related charges, defendants moved to suppress the items recovered from their persons and the Mustang as the fruits of an unlawful seizure. At a hearing held on defendants’ suppression motion, the officers testified to the facts set forth above, and the People presented the audio recording of the 911 call. Following the presentation of the evidence, Supreme Court initially issued a written decision granting defendants’ suppression motion, reasoning that, under the U.S. Supreme Court’s decision in Florida v J.L. (529 US 266 [2000]), the 911 caller’s failure to predict defendants’ future actions rendered his assertions too unreliable to support the stop of the car.
Subsequently, the People moved for reargument and reconsideration of the suppression decision. The court issued a written decision granting the People’s motion and, upon reconsideration, vacating its prior suppression decision and denying defendants’ motion to suppress the physical evidence. Discussing the relevant legal framework, the court noted that an anonymous informant’s hearsay report of criminal activity may give rise to probable cause justifying an arrest if the report satisfies the two prongs of the Aguilar-Spinelli test. The court further observed that, because a tip that satisfies the Aguilar-Spinelli standard may support an arrest, such a tip may also be reliable enough to create reasonable suspicion justifying the lesser intrusion of an investigatory stop.
Under those legal standards, the court found that the 911 caller’s statements here were reliable enough to authorize Officer Valles to stop defendants’ car. The court determined that, because the 911 caller had provided an accurate description of the Mustang, the van and their location, his report established his credibility and thereby met the veracity prong of the AguilarSpinelli test. And, the court concluded, the caller’s statements demonstrated the basis of the caller’s knowledge, in satisfaction of the basis-of-knowledge prong of the Aguilar-Spinelli test, because the caller declared that he had personally seen the occupants of the Mustang place a large gun therein. The court also distinguished Florida v J.L. from this case. Additionally, *1147 the court rejected defendants’ claim that the officers had acted unreasonably in surrounding the Mustang and ordering defendants out of the car at gunpoint. In the court’s view, the officers had taken those lawful precautions out of a reasonable concern for their safety. Thus, the court denied defendants’ suppression motion in its entirety.
Thereafter, defendant Argyris pleaded guilty to two counts of criminal possession of a weapon in the second degree (see Penal Law § 265.03 [1] [b]), one count of criminal possession of a weapon in the fourth degree (see Penal Law § 265.01) and one count of unlawful possession of pistol ammunition (see Administrative Code of City of NY § 10-131 [i] [3]), and he was sentenced to an aggregate determinate prison term of 3x/2 years. Defendant DiSalvo pleaded guilty to four counts of criminal possession of a weapon in the second degree (see Penal Law § 265.03 [1] [b]; [3]), three counts of criminal possession of a weapon in the third degree (see Penal Law § 265.02 [1]) and one count of unlawful possession of pistol ammunition (see Administrative Code of City of NY § 10-131 [i] [3]), and he was sentenced, as a second felony offender, to an aggregate determinate prison term of six years, to be followed by five years of postrelease supervision. Defendants appealed from the respective judgments against them, challenging Supreme Court’s suppression ruling.
The Appellate Division, Second Department, issued separate decisions and orders affirming the judgments in each case (see People v DiSalvo, 99 AD3d 811 [2d Dept 2012]; People v Argyris, 99 AD3d 808, 808-811 [2d Dept 2012]). In People v Argyris, the Appellate Division first concluded that “[t]he Aguilar-Spinelli test . . . need not be satisfied where [as here] the necessary predicate for justifying the police action under review is the less demanding standard of reasonable suspicion” (99 AD3d at 810 [internal quotation marks and citations omitted]). The court determined that Officer Valles had the requisite reasonable suspicion to stop the Mustang because “the report of the 911 caller, which was based on the contemporaneous observation of conduct that was not concealed, was sufficiently corroborated to provide reasonable suspicion for the stop” (see id. [internal quotation marks and citations omitted]). Furthermore, the court decided that the police had otherwise acted lawfully when they ordered defendants out of the car at gunpoint, and because the officers properly obtained the relevant evidence from defendants and their car, Supreme Court had correctly denied their suppression motion and accepted their guilty pleas (see id. at 810-811).
*1148 In a separate decision and order citing its decision in People v Argyris, the Appellate Division affirmed the judgment in People v DiSalvo and remitted that case to Supreme Court for proceedings regarding defendant DiSalvo’s bail under CPL 460.50 (5) (see DiSalvo, 99 AD3d at 811-812). A Judge of this Court granted defendants leave to appeal from the Appellate Division’s orders (People v Argyris, 21 NY3d 1013 [2013]; People v DiSalvo, 21 NY3d 1015 [2013]).

People v Johnson

At about 9:22 p.m. on October 1, 2011, a police dispatcher radioed Yates County Sheriffs Deputy Arlyn Cunningham, Jr. and told him that “a civilian had called 911 and stated that she believed that the driver” of a blue BMW with a particular license plate number was “sick or intoxicated” at the intersection of Route 245 and Sunnyside Road in the Town of Italy, which is near the border between Yates County and Ontario County. As far as the record shows, the 911 call was not recorded in any way.
Deputy Cunningham, in his marked patrol car, started driving south on Route 245 in search of the BMW. Cunningham drove to the intersection referenced in the 911 call, but he did not see the BMW. After “deciding] which was the most probable route of travel” for the BMW, Cunningham continued driving south on Route 245 and crossed into Ontario County.
Deputy Cunningham entered the Town of Naples, and he stopped at a stop sign at the intersection of Route 245 and Route 21. At the stop sign, he saw the blue BMW with the license plate number described in the 911 caller’s report. The BMW turned left onto Route 21. As Cunningham followed the BMW, that vehicle went a short distance and then made a “hasty” right turn onto Tobey Street. In particular, the BMW activated its turn signal at the last moment, made a wide right turn, went briefly into the lane of Tobey Street used by oncoming traffic and then quickly entered the correct lane. Cunningham turned onto Tobey Street and activated his emergency lights and siren. As Cunningham would later testify at the suppression hearing in this case, he pulled over the BMW based on his suspicion that the driver was driving while intoxicated and also upon his observation of the driver committing a traffic violation. However, Cunningham knew that he could not arrest the driver for the traffic violation because relevant statutes prevented him from arresting someone for a traffic violation outside of Yates County (see CPL 140.10 [2] [a]; cf. CPL 140.10 [1] [b]).
*1149 Deputy Cunningham approached the BMW, and he saw defendant, Dr. Eric Johnson, in the driver’s seat, accompanied by a female in the passenger’s seat. Cunningham noticed that defendant had glassy eyes, a fixed gaze and breath that smelled strongly of alcohol. Cunningham asked defendant to divulge his personal identifying information and his activities that evening. In response, defendant fumbled through his wallet for his driver’s license and slurred his words, further convincing Cunningham that he was intoxicated. Cunningham radioed the dispatcher, reported that he had stopped defendant’s car and requested that an Ontario County Deputy come to the scene to assist him.
About half an hour later, Ontario County Sheriff’s Deputy David Drake responded to the scene, where he also saw defendant exhibiting telltale signs of intoxication. Drake had defendant perform three field sobriety tests, all of which defendant failed. Concluding that defendant had been driving while intoxicated, Drake arrested defendant on that charge and transported him to the station house. There, defendant agreed to take a breath test to measure his blood alcohol content, and the test results revealed that defendant had a blood alcohol content of 0.15% by volume — nearly twice the legal threshold for driving while intoxicated under Vehicle and Traffic Law § 1192 (2).
After being charged with several counts of driving while intoxicated, defendant moved to suppress his statements to the police and the results of the breath test on the ground that such evidence was the fruit of an unlawful vehicle stop unsupported by reasonable suspicion or probable cause. At a suppression hearing in Town Court, Deputies Cunningham and Drake testified to the facts described above.
Following the hearing, Town Court issued a written decision denying defendant’s suppression motion in its entirety. The court concluded that Cunningham had properly stopped and, with the aid of Deputy Drake, lawfully arrested defendant. According to the court, the 911 caller’s tip about a possible incident of driving while intoxicated had authorized Cunningham to follow and “close in” on defendant’s car. Once Cunningham saw defendant make a wide right turn, the court opined, Cunningham had “justification for the stop and investigation of a possible crime of DWI.” And, given that Cunningham saw defendant exhibit signs of intoxication upon stopping the car, Cunningham and Drake had the right to arrest defendant for *1150 driving while intoxicated. Consequently, the court ruled, defendant’s statements and the breath test results had been lawfully obtained pursuant to a valid stop and arrest.
Defendant moved for reargument, which the court denied. Subsequently, defendant pleaded guilty to a misdemeanor count of driving while intoxicated (see Vehicle and Traffic Law § 1192 [3]), and he was sentenced to a six-month suspension of his driver’s license, a conditional discharge and various fines. Defendant appealed.
County Court affirmed the judgment. County Court decided that Deputy Cunningham had no authority to stop defendant for the traffic violation of making a wide right turn, saying, “Inasmuch as the deputy who [had] stopped the vehicle, Deputy Cunningham, did not view the defendant drive his vehicle in Yates County, . . . Deputy Cunningham was without authority to stop the defendant for a traffic infraction.” Nonetheless, County Court determined that the 911 caller’s tip had given Cunningham reasonable suspicion that defendant had been driving while intoxicated, thereby authorizing Cunningham to stop defendant’s car for that crime even in another county. Specifically, the court decided that, because the tip had accurately identified defendant’s car and approximate location, it was reliable enough to establish reasonable suspicion, especially when coupled with Cunningham’s personal observation of defendant committing a traffic violation. Thus, the court concluded that defendant’s suppression motion had been properly denied and affirmed the judgment. A Judge of this Court granted defendant leave to appeal (23 NY3d 1021 [2014]).
II
A
To be reliable enough to establish probable cause for an arrest as a matter of state constitutional law, an anonymous hearsay informant’s report of criminal activity must: (1) provide sufficiently detailed information to indicate the informant’s reliability as an informant, or in other words, his or her veracity; and (2) convey information showing a reliable basis for the informant’s knowledge of the reported illegal activity (see People v Edwards, 95 NY2d 486, 495 [2000]; Johnson, 66 NY2d at 406-407; People v Elwell, 50 NY2d 231, 236-237 [1980]; People v West, 44 NY2d 656, 657 [1978]; see also Spinelli, 393 US at 412-413; Aguilar, 378 US at 114-115). In adopting this rule under *1151 the State Constitution, we have refused to follow the U.S. Supreme Court’s decision in Illinois v Gates (462 US 213 [1983]), which holds that the two prongs of the Aguilar-Spinelli test are merely “relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations” under the Fourth Amendment (Gates, 462 US at 233; contrast Johnson, 66 NY2d at 406-407).
Just as reliable hearsay can supply the police with probable cause, such hearsay can give rise to reasonable suspicion, which is the lesser level of suspicion required to authorize an investigatory stop of a person or a moving car under the four-tiered framework of People v De Bour (40 NY2d 210 [1976]) — also sometimes called a level-three stop under De Bour or, in federal constitutional parlance, a Terry stop (see Navarette v California, 572 US —, —, 134 S Ct 1683, 1687-1688 [2014]; Adams v Williams, 407 US 143, 147 [1972]; Terry v Ohio, 392 US 1, 20-27 [1968]; People v Landy, 59 NY2d 369, 376 [1983]). In the past, we interpreted the State Constitution to permit a level-three stop based on a hearsay report that did not meet both prongs of the Aguilar-Spinelli standard for reliability (see People v Salaman, 71 NY2d 869, 870 [1988]; Landy, 59 NY2d at 376). Even then, we did not retreat from our general admonition against police reliance on unreliable anonymous tips, noting that hearsay information of that kind was “the weakest sort” of support for a forcible detention (De Bour, 40 NY2d at 224). Subsequent developments in federal constitutional jurisprudence cast significant doubt on our prior holdings that “unsubstantiated hearsay” reports of criminality are reliable enough to authorize the police to conduct a level-three stop supported by reasonable suspicion (Landy, 59 NY2d at 376).
The relevant changes in federal law originated in Alabama v White (496 US 325 [1990]), in which the U.S. Supreme Court explained that the police cannot detain someone based on completely uncorroborated hearsay and may only act on tips bearing significant indicia of reliability. In that case, an anonymous hearsay tip apprised the police of the movements of a suspect in detail and alleged that the suspect would have drugs in an attaché case (see White, 496 US at 327). Although the police did not see the case upon spotting the suspect, they followed her and stopped her before she reached the destination reported in the tip (see id.). The police then recovered a case of drugs from the suspect’s car (see id.). The Supreme Court upheld the legality of the stop, finding that this was a “close case” *1152 but that the tip bore sufficient “indicia of reliability” to give the police reasonable suspicion to stop the suspect’s car (id. at 327-332). The Court found it particularly significant that the tip predicted the suspect’s movements, as such predictive information could only have come from a person with reliable insider knowledge of the suspect’s affairs (see id. at 331-332). Accordingly, under White, an anonymous tip cannot support the stop of a car unless it bears sufficient indicia of reliability under the totality of the circumstances, and one important indicium of reliability is a tip’s prediction of the future behavior of the suspect.
Subsequently, in Florida v J.L., the Supreme Court invalidated a stop predicated upon a bare-bones tip while suggesting that not all tips need the sort of predictive information discussed in White to be reliable. In J.L., an anonymous caller, whose call was not recorded, told the police that “a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun” (J.L., 529 US at 268). Based on the tip, the police stopped 15-year-old J.L. merely because he matched the description, and they recovered a gun from him (see id.). They also frisked two other men who were standing near him, despite the fact that the tip had not mentioned those individuals (see id.). The Supreme Court held that the stop was illegal because “[t]he tip in the instant case lacked the moderate indicia of reliability present in White and essential to the Court’s decision in that case,” and hence the tip did not provide the police with reasonable suspicion (id. at 271). At the same time, the Court observed that the absence of predictive information was not the only source of the deficiency in the tip, as the tip was also unreliable because the “unknown, unaccountable informant . . . neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.” (id. [emphasis added]). In a concurrence, Justice Kennedy and Chief Justice Rehnquist reenforced this point, suggesting that indicia of reliability such as recording of an anonymous 911 call might allow the police to stop a suspect, regardless of the presence or absence of predictive information (see id. at 274-276 [Kennedy, J., concurring]).
Given White’s and J.L’s reliability requirements for anonymous tips underlying Terry stops, we have subsequently abandoned certain aspects of our prior precedent permitting a stop based on “unsubstantiated hearsay” (Landy, 59 NY2d at 376), acting on constraint of federal constitutional law. For *1153 example, in consolidated appeals in People v William II and People v Rodriguez, we followed J.L.’s stricter approach to the reliability analysis under the Federal Constitution, invalidating the stops in both cases based on tips that, in our view, were not sufficiently reliable under J.L.’s mandate (see People v William II, 98 NY2d 93, 98-100 [2002]). Specifically, we decided that, since the tips lacked both predictive information and any indication that the informants had firsthand knowledge of the relevant crimes, the tips were unreliable “[u]nder the requirements of Florida v J.L.” (id. at 99). Thus, in William II, we necessarily rejected certain facets of our prior decisions that established a low threshold for reliability in the reasonable suspicion context. In particular, that case stands for the proposition that, under the Fourth Amendment, an anonymous tip is unreliable if it is not made via 911, does not include a statement of the informant’s firsthand knowledge of the contents of the report and does not provide any predictive information. In reaching that conclusion, we did not conduct any independent state constitutional analysis of the reliability of the tips at issue in William II, instead relying exclusively on U.S. Supreme Court precedent.
More recently, in People v Moore (6 NY3d 496 [2006]), we again evaluated the reliability of an anonymous tip under the Federal Constitution and concluded, in part based on the lack of predictive information in the tip before us, that the tip was not sufficiently trustworthy to give rise to reasonable suspicion (see Moore, 6 NY3d at 497-501). In doing so, we relied on William II's interpretation of J.L., holding that the tip at issue, which did not feature any predictive information, lacked any suggestion of the informant’s firsthand knowledge of the crime and was contradicted by the officers’ observations at the scene, was not sufficiently reliable to authorize the police to conduct an investigatory stop of the suspect (see id. at 498-501).
In Moore, we also said that “[a]n anonymous tip cannot provide reasonable suspicion to justify a seizure, except where that tip contains predictive information — such as information suggestive of criminal behavior — so that the police can test the reliability of the tip” (id. at 499 [emphasis added]). However, that pronouncement was not essential to our holding. In deciding that the tip implicating the suspect was unreliable, rather than relying on the absence of predictive information, we cited numerous other aspects of the tip that called its credibility into doubt. Thus, our comment about the possible necessity of predictive information was dicta based on our understanding of *1154 federal constitutional law at the time, and we did not establish a predictive information requirement independently rooted in the State Constitution.
After our decision in Moore, the U.S. Supreme Court explained in Navarette v California that predictive information is not the sine qua non for the reliability of an anonymous hearsay tip under the Federal Constitution. In Navarette, a police dispatch team from one county in California relayed the contents of a 911 call to a dispatch team in another county (see Navarette, 572 US at —, 134 S Ct at 1686). The reporting dispatchers described the call to the other team as follows: “[s] ho wing southbound Highway 1 at mile marker 88, Silver Ford 150 pickup. Plate of 8-David-94925. Ran the reporting party off the roadway and was last seen approximately five [minutes] ago” (572 US at —, 134 S Ct at 1686-1687). The receiving dispatch team, in turn, transmitted the information to highway patrol officers (see 572 US at —, 134 S Ct at 1687). Roughly 10 minutes later, a highway patrol officer saw the above-described truck near mile marker 69 — not far from marker 88 referenced in the 911 report (see id.). About five minutes later, the officer pulled over the truck, and another officer joined him at the scene (see id.). When the officers approached the truck, they smelled marijuana and, upon searching the vehicle, recovered 30 pounds of that substance (see id.). The officers arrested Lorenzo and Jose Navarette, who were the driver and passenger in the truck (see id.).
By a vote of five to four, the Supreme Court affirmed the California courts’ decisions denying suppression of the drugs (see 572 US at —, 134 S Ct at 1686-1692). The Court concluded that the 911 call, as conveyed via the dispatchers, had provided the patrol officers with reasonable suspicion supporting their stop of the Navarettes’ truck because, “[e]ven assuming for present purposes that the 911 call was anonymous, . . . the call bore adequate indicia of reliability for the officer to credit the caller’s account” of events (572 US at —, 134 S Ct at 1688). In the Court’s view, “[b]y reporting that she had been run off the road by a specific vehicle — a silver Ford F-150 pickup, license plate 8D94925 — the caller necessarily [had] claimed eyewitness knowledge of the alleged dangerous driving,” which “len[t] significant support to the tip’s reliability” (572 US at —, 134 S Ct at 1689). The Court distinguished J.L. from the case before the Court on the basis that, unlike the tipster in J.L. who “provided no basis for concluding that [he] had actually seen the gun,” *1155 the 911 caller in this case evidently had personally witnessed the truck driver’s unlawful drunk driving (id.).
The Court further determined that the tip contained information showing that the caller was telling the truth, including the contemporaneous nature of the tipster’s report and the officers’ success in corroborating the report’s description of the truck’s appearance and location within a short time of receiving the dispatch about it (see id.). The Court also stated that, since “a false tipster would think twice before using” an emergency 911 system that allows the authorities to obtain the tipster’s telephone number and to record the call for future voice identification, the instant tipster’s decision to make her report via the 911 system further reflected her veracity (572 US at —, 134 S Ct at 1689-1690). In addition to finding the tip reliable, the Court concluded that the caller’s report had provided the officers with reasonable suspicion that the driver of the truck had engaged in criminal, as opposed to innocuous, activity because the report noted that the driver had run the caller off the road in a telltale sign of unlawful drunk driving (see 572 US at —, 134 S Ct at 1690-1692).
The dissenting Justices concluded that the anonymous tip was not sufficiently corroborated to establish reasonable suspicion (see 572 US at —, 134 S Ct at 1692-1694 [Scalia, J., dissenting]). Noting that in White the Court had found an anonymous tip to be reliable based on the predictive information reported by the tipster, the dissent pointed out that no similar predictive information bolstered the tip accusing the Navarettes (see 572 US at —, 134 S Ct at 1693). The dissent stated, “The claim to ‘eyewitness knowledge’ of being run off the road supports not at all its veracity; nor does the amazing, mystifying prediction (so far short of what existed in White) that the petitioners’ truck would be heading south on Highway 1” (id.).
Otherwise, the dissent concluded that little, if anything, demonstrated the reliability of the 911 caller’s report, and the dissent took issue with the majority’s reliance on the caller’s use of the 911 system, saying:
“Finally, and least tenably, the Court says that another ‘indicator of veracity’ is the anonymous tipster’s mere ‘use of the 911 emergency system’ . . . But assuming the Court is right about the ease of identifying 911 callers, it proves absolutely nothing in the present case unless the anonymous caller was aware of that fact. ‘It is the tipster’s belief in *1156 anonymity, not its reality, that will control his behavior.’ There is no reason to believe that your average anonymous 911 tipster is aware that 911 callers are readily identifiable” (572 US at —, 134 S Ct at 1692-1694 [citations omitted]).
In light of the majority and dissenting opinions in Navarette, it is clear that, under the Federal Constitution, predictive information is not an essential indicium of reliability necessary to support a vehicular stop based on an anonymous tip, for the tip in Navarette included no such information. Rather, other factors, such as a tipster’s statement indicating that he or she personally observed someone engaged in suspicious behavior, may supply the requisite indicia of reliability that allow the tip to serve as the basis for a stop (see Navarette, 572 US at —, 134 S Ct at 1688-1689). Accordingly, our passing comment in Moore that “[a]n anonymous tip cannot provide reasonable suspicion to justify a seizure, except where that tip contains predictive information” (Moore, 6 NY3d at 499) is no longer an accurate statement of federal constitutional law (cf. majority mem at 1141). However, there remains a question as to whether it should become the law of New York under the State Constitution.
B
In the wake of Navarette, the parties in the instant cases propose various state constitutional tests for determining whether an anonymous hearsay account of criminal activity is sufficiently reliable to authorize a brief investigatory stop of a person or his or her automobile. Defendants in all three cases urge us to hold that the State Constitution forbids a police officer to detain a suspect based on an anonymous tip unless the tip contains predictive information. In Argyris and DiSalvo, the People press for adoption of Navarette’s totality-of-the-circumstances analysis as the law of New York. Regardless of the proper baseline for the reliability of a tip supporting a stop, the People contend that we should not prevent the police from stopping a suspect based on a tip that complies with the Aguilar-Spinelli rule. In Johnson, the People ask us to overrule our prior decisions adopting the Aguilar-Spinelli test for the reliability of a tip in the probable cause context. Instead of the Aguilar-Spinelli standard, the People maintain, our state constitutional jurisprudence should employ the analyses in Gates and Navarette to determine whether an anonymous tip can create probable cause or reasonable suspicion.
*1157 I would not adopt wholesale the standards advocated by the parties under the State Constitution. Instead, for the reasons that follow, I would hold that, under the State Constitution, the police may not rely on an anonymous tip to briefly detain or arrest a suspect unless the tip satisfies both prongs of the AguilarSpinelli test.
In our existing search and seizure jurisprudence under the State Constitution, we have not set forth any clearly defined minimum standard of reliability in an anonymous tip that permits a police officer to conduct a De Nowr-level-three stop. Nonetheless, our long-standing practice of granting New York citizens enhanced protection against unwarranted police intrusions based on hearsay, which originally prompted us to incorporate the Aguilar-Spinelli rule into probable cause determinations, supports the extension of the Aguilar-Spinelli rule to the evaluation of a level-three stop.
In that regard, although the Federal and State Constitutions’ search and seizure provisions first arose from a shared fear that the sovereign might oppress the governed by arresting them upon “common rumor and report rather than upon proof of reasonable grounds for believing a crime to have been committed” (Elwell, 50 NY2d at 236), this concern has taken on special significance under the State Constitution (see People v Griminger, 71 NY2d 635, 638-641 [1988]; Johnson, 66 NY2d at 406-407; Elwell, 50 NY2d at 241). For that reason, we have rejected Gates and adhered to the Aguilar-Spinelli standard for evaluating the reliability of a tip as the basis for an arrest (see People v Griminger, 71 NY2d 635, 638-641 [1988]; Johnson, 66 NY2d at 406-407; Elwell, 50 NY2d at 241). And, the same concern that caused us to follow the Aguilar-Spinelli rule in the arrest context is still valid today and applies with equal force to investigatory stops precipitated by anonymous tips. As is true of an arrest premised on uncorroborated anonymous hearsay, a stop based on an unreliable tip may unjustly expose an individual to a high degree of physical intrusion without any credible cause for suspicion. If such stops were permitted, the police could freely abuse the people on authority of the most preposterous reports, and malicious tipsters could easily use incredible rumors to convince the police to physically harass the targets of the tipsters’ ire. As in the arrest context, the State Constitution must reduce these dangers by precluding the police from physically seizing an individual based on a tip that does not meet Aguilar-Spinelli’s reliability criteria.
*1158 In addition, the application of the Aguilar-Spinelli test to anonymous hearsay reports underlying investigatory stops furthers “the aims of predictability and precision in judicial review of search and seizure cases” (Johnson, 66 NY2d at 407). Because we have used the Aguilar-Spinelli test to judge the reliability of hearsay tips for the past 39 years (see People v Hanlon, 36 NY2d 549, 556 [1975]), defendants have relied on that standard as a basic guarantee of their rights, anchoring their expectations regarding the legality of a seizure and the admissibility of evidence obtained therefrom in the Aguilar-Spinelli framework. Likewise, New York law enforcement officers have become accustomed to the need to conform their practices to the dictates of the Aguilar-Spinelli rule, and there is no evidence or logical basis on which to conclude that the law enforcement community has found the demands of the rule to be incomprehensible or unusually burdensome. Given that our state’s jurists have also applied the Aguilar-Spinelli doctrine routinely and without apparent difficulty in the arrest context, they should be able to reliably and fairly employ that standard when deciding whether a tip is reliable enough to support a stop, thereby enhancing the predictability of judicial review.
Although defendants find the Aguilar-Spinelli test too lax and the People characterize it as too strict, both criticisms principally derive from a shared belief that the test’s two prongs do not independently add much of value to the reliability determination and ignore other relevant indicia of reliability or flaws in a given tip. My concurring colleague shares this concern (see concurring op of Smith, J. at 1142). But our precedent readily answers those charges. As we explained in People v Rodriguez (52 NY2d 483 [1981]) and People v DiFalco (80 NY2d 693 [1993]), each prong of the Aguilar-Spinelli test acts as a vital independent safeguard against unwarranted governmental intrusions based on unreliable hearsay. The basis-of-knowledge prong guarantees that the police do not forcibly detain a citizen pursuant to the report of an informant who is honest but has relied on incomplete secondhand knowledge of the relevant events (see DiFalco, 80 NY2d at 698; Rodriguez, 52 NY2d at 491). The veracity prong separately ensures that the police will not stop someone simply because an unscrupulous informant, who possesses plenty of accurate personal knowledge of what happened, twists the facts to falsely accuse the suspect of a crime (see DiFalco, 80 NY2d at 698-699; Rodriguez, 52 NY2d at 488-490). The twofold framework accounts for the reality that a *1159 tipster’s surfeit of honesty cannot fully compensate for a deficit in his knowledge (and vice versa), regardless of what other types of information in the tip might be deemed indicia of reliability under Navarette. Thus, the Aguilar-Spinelli test’s separate prongs establish adequate protections against seizures based on unreliable hearsay tips while simultaneously providing a practical and analytically useful lens through which to view the trustworthiness of such tips.
The People ask us to abandon the Aguilar-Spinelli test on the theory that its inflexibility has made it intolerably difficult for the police to comply with. The People claim that, because every state in the Union, save for New York and five others, has rejected the Aguilar-Spinelli standard and adopted the Gates analysis, those other jurisdictions’ experiences with the AguilarSpinelli rule must have proven that the rule is unworkable and wholly incompatible with effective law enforcement. However, while the considered opinions of other jurisdictions often carry significant weight in our evaluation of legal doctrine, I do not find the out-of-state authority cited by the People to be a sufficiently compelling basis on which to cast aside the AguilarSpinelli rule. Those out-of-state decisions do not compensate for the absence of proof that the Aguilar-Spinelli rule has intolerably taxed the New York law enforcement community over the decades in which we have applied the rule. And, although it is generally desirable to maintain uniformity with the law of other jurisdictions when doing so does not compromise a significant public policy or legal principle unique to New York, we have already held that considerations of uniformity in the evaluation of anonymous tips must yield to “aims of predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens,” which are “best promoted by applying [the] State constitutional standards” embodied in the Aguilar-Spinelli standard (Johnson, 66 NY2d at 407).
For their part, defendants and my dissenting colleagues {see dissenting op of Rivera, J. at 1169, 1176-1177) interpret Moore as creating a state constitutional rule that, even where a tip meets the Aguilar-Spinelli standard, it cannot support the temporary detention of a suspect if it does not also contain predictions of the suspect’s future activities. However, for reasons I have already explained, Moore does not establish such a state constitutional rule. Nor do I now perceive any reason to create a special predictive information requirement under the *1160 State Constitution because the Aguilar-Spinelli standard fully accounts for the value of the type of predictive information discussed in White and J.L. As the Supreme Court noted in White, an anonymous tip containing predictive information is highly reliable precisely because it shows “not only that the [tipster] [i]s honest,” i.e., that his or her veracity is established, “but also that [the tipster] [i]s well informed,” meaning he or she has a reliable basis of knowledge of the suspect’s crime (White, 496 US at 332). In other words, a tip’s prediction of the suspect’s future activities is simply one of many possible pieces of information that can satisfy the basis-of-knowledge prong of the Aguilar-Spinelli test. Therefore, the presence or absence of predictive information in a tip already carries its proper significance in the Aguilar-Spinelli framework and need not be transformed into an independent prerequisite for a finding of reliability.
According to defendants, a predictive information requirement for the reliability of an anonymous tip is necessary to ensure that the police can “test” the credibility of the tip via their own observations of the behavior predicted by the tipster. However, when compared to other forms of information that satisfy the basis-of-knowledge prong of the Aguilar-Spinelli test, predictive information does not necessarily make the police more or less capable of “testing” the truthfulness of a tipster’s account of the crime itself at the constitutionally critical juncture; even when armed with predictive information, the police still must usually decide whether to seize a suspect before they can personally observe that the suspect has committed or will commit a crime as described by the tipster.
White illustrates this point. There, the tipster gave the police exact predictions of the suspect’s future movements and made an allegation that the suspect would be carrying a case full of drugs, but before detaining the suspect, the police did not personally observe her holding the case and were unable to test the truthfulness of the tipster’s report that she possessed drugs (see White, 496 US at 327). It was only after the police stopped the suspect and searched her car that they were able to confirm that the tipster had accurately reported the suspect’s possession of the drugs (see id.). Hence, prior to the stop, the predictive information in the tip did not assist the police in “testing” whether the tipster had truthfully reported the suspect’s illegal acts. Thus, the facts of White reflect the general truth that, regardless of whether an anonymous informant evidently knows about an individual’s crime via personal affiliation or firsthand *1161 observation, the police usually cannot corroborate the informant’s allegations of criminal conduct until they stop the suspect, and predictive information rarely resolves that difficulty.
In addition, a predictive information requirement would do little to eliminate the concern that a tipster will maliciously send false information to the police. In that regard, only people with unique knowledge of a suspect’s affairs, such as a close friend, relative, accomplice or insider in the suspect’s criminal scheme, can provide the police with predictive information, and consequently a predictive information requirement would force the police to rely exclusively on such insiders. Yet, contrary to defendants’ apparent supposition, insider tipsters are no less likely than members of the general public to concoct baseless accusations of criminality as a way to harass a suspect. Indeed, one can conceive of many examples of a tipster who is familiar with a suspect’s plans and might forward them to the police, along with a fabricated report of criminal activity, to settle a score.
Defendants’ proposal to categorically forbid the police to conduct an investigatory stop predicated upon a tip that lacks predictive information would also place an excessive restraint on law enforcement. Because members of “[t]he general public” who witness a crime “ha[ve] no way of knowing” what the perpetrator will do next (see White, 496 US at 332), they cannot supply any predictive information to the police, and therefore a predictive information requirement would prevent the police from seizing a suspect solely in reliance on a tip received from an ordinary citizen who wishes to report a crime while remaining anonymous. Given that many crimes are reported to the police exclusively in that way, defendants’ rule would unacceptably curtail the punishment and prevention of numerous serious offenses that are credibly reported by regular citizens. Like the Court (see majority mem at 1141), I cannot endorse this approach that senselessly endangers the public and erodes enforcement of the law without any compelling justification. I agree with my dissenting colleagues that the State Constitution must provide robust protections for the rights of defendants, but the strong safeguards of article I, § 12 of the State Constitution do not extend so far as to completely overthrow the sensitive balance between individual liberty and public order contemplated by the Constitution.
In light of the considerations outlined above, I would conclude that the Aguilar-Spinelli test should govern the determination *1162 of whether an anonymous tip is sufficiently reliable to authorize the physical detention of a person by the police.
Of course, a court’s finding that an anonymous tip is reliable under the Aguilar-Spinelli test does not end the inquiry into the lawfulness of a stop or arrest based on that tip. After all, “[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that criminal activity may be afoot” (Navarette, 572 US at —, 134 S Ct at 1690 [internal quotation marks and citation omitted]). Thus, as a matter of law and logic, an officer receiving an anonymous tip cannot stop the suspect unless the tipster’s description of the suspect’s criminal conduct includes such details as would create reasonable suspicion in an officer who had seen the same details or learned such facts from a fellow officer (see generally People v Hendricks, 25 NY2d 129, 136 [1969]). Likewise, where the tipster’s statements about the actual crime feature the sort of details that would engender probable cause when gleaned by an officer via personal observation or another reliable source, the officer receiving the tip may lawfully arrest the suspect. Moreover, it is well settled that, even if a tip does not meet the Aguilar-Spinelli standard or does not feature adequate details to confer reasonable suspicion upon the officer who hears it, the officer’s personal observation of the suspect engaged in suspicious activity may, in combination with the tip, give rise to reasonable suspicion or probable cause (see Elwell, 50 NY2d at 241 [concluding that, where an informant “d(oes) not indicate the basis for his knowledge,” “the rule under our Constitution should be that a warrantless search or arrest will be sustained only when the police observe conduct suggestive of, or directly involving, the criminal activity”]).
m
Having laid out relevant state constitutional guidelines, I now address the application of those rules to the facts of the cases before us.
A
In Argyris and DiSalvo, I conclude that the police lawfully stopped defendants’ car based on an anonymous tip that was reliable under the Aguilar-Spinelli test and sufficiently detailed in its description of their criminal conduct to create reasonable suspicion. On the reliability front, the 911 caller who accused defendants Argyris and DiSalvo of having a gun in their car *1163 plainly supplied the police with information that satisfied the veracity prong of the Aguilar-Spinelli test. Since the “veracity prong of the Aguilar/Spinelli test may, in a proper case, be established through corroboration where the police have verified only noncriminal details of activity referred to in the informant’s statement” (DiFalco, 80 NY2d at 699), the 911 caller’s statements about numerous aspects of the suspects’ appearance, vehicles and non-criminal activity, all of which were corroborated by the officers’ observations of the same, fulfilled the veracity requirement.[2]
Turning to the basis-of-knowledge prong, that prong can be established, as it was here, by an anonymous informant’s statement that he or she has just personally witnessed an unconcealed crime. Given that the report is allegedly contemporaneous, the police can verify some aspect of the informant’s reliability by confirming that the individual accused of criminality remains in the area reported by the tipster shortly after the tip has been received. By claiming personal knowledge, the tipster puts his or her own credibility on the line rather than seeking to hide behind a secondhand hearsay source; the tipster knows that, if the police arrive on the scene and see that the situation is not as described, they will discredit the tip completely rather than assume that the error resulted from the miscommunication of only a few details by another individual who transmitted the information to the tipster. Furthermore, from the claim of eyewitness information and the other contents of the tip, the police may discern whether it is plausible for someone to have personally seen the activities alleged under the circumstances in which they have purportedly occurred.
For those reasons, contrary to the contention of my dissenting colleagues (see dissenting op of Rivera, J. at 1177-1179, 1179-1180), *1164 the tipster’s roughly contemporaneous assertion of an unconcealed criminal act may satisfy the basis-of-knowledge prong of the Aguilar-Spinelli test in this context (see Spinelli, 393 US at 425 [White, J., concurring] [“(W)hat is necessary under Aguilar is one of two things: the informant must declare either (1) that he has himself seen or perceived the fact or facts asserted; or (2) that his information is hearsay, but there is good reason for believing it”]; Brown v United States, 365 F2d 976, 979 [DC Cir 1966] [where police received a report of a robbery of a certain establishment from an anonymous victim, who allegedly personally witnessed the robbery, the basis-of-knowledge prong was satisfied]; People v Torres, 155 AD2d 231, 232 [1st Dept 1989] [“As to the second prong of the Aguilar-Spinelli test, the informant’s basis of knowledge, that was easily established in that the informant stated that he was basing his report on his own personal knowledge, gained through direct observations”]; Commonwealth v Amral, 407 Mass 511, 514, 554 NE2d 1189, 1192 [1990] [“The informant’s observation of the contraband in the place to be searched satisfies the basis of knowledge test”]; cf. United States ex rel. Kislin v State of New Jersey, 429 F2d 950, 953-954 [3d Cir 1970] [indicating that affidavit stating an unidentified informant, who was not identified as a confidential informant with prior dealings with the police, had “personal knowledge” that defendants had been engaged in specified illegal gambling activities satisfied the basis-of-knowledge prong but not the reliability prong]).
Since the 911 caller here stated that he had acquired eyewitness knowledge of defendants’ illegal weapon possession at around the time of the call, his report met the basis-of-knowledge prong. Indeed, the caller’s report was clearly contemporaneous, as he said that he was coming out of a building at his current location when he saw one of the suspects put a gun in the Mustang, and he added that the suspect “just went” down to 28th Street.[3] Because the caller’s tip satisfied both prongs of the Aguilar-Spinelli test, the police were entitled to effect a seizure in reliance on it, assuming that the tip contained enough information about the crime to create reasonable suspicion.
*1165 In that regard, as previously discussed, a tip that is reliable under the Aguilar-Spinelli rule nonetheless cannot authorize a seizure unless it also features a sufficient description of the crime to give rise to reasonable suspicion, in the case of a Terry stop, or probable cause, in the case of an arrest. Here, in addition to being reliable, the tip contained enough information about the crime to create reasonable suspicion. Although a more fleshed-out report of criminal activity would have been preferable, the tipster’s basic statements were sufficient in light of the nature of the crime alleged. In that respect, it should be noted that the crime at issue, illegal gun possession, naturally tends to be described in sparse fashion because it does not involve many detailed movements, and one can accurately sum up someone’s illegal gun possession by saying the person is holding a gun in a public place. Even so, the caller here provided more than the typical simplistic statement that someone “has” or “is holding” a gun. The caller explained that: (1) one of the large white males possessed a gun; (2) the gun was a “big gun”; and (3) the gun was specifically placed in the back of the car. While not overwhelmingly detailed, these allegations sufficed to supply the police with reasonable suspicion that defendants and the other occupants of the car were involved in unlawful gun possession outside their homes or places of business (see Penal Law §§ 265.01 [1]; 265.03 [1], [3]). Therefore, on this record, the courts below did not err in finding that the police lawfully stopped the car based on reasonable suspicion of illegal weapon possession, in compliance with the State Constitution.
When the police surrounded the car with officers, drew their weapons and ordered defendants out of the car, they acted reasonable and lawfully out of a justifiable concern for their safety (see People v Brnja, 50 NY2d 366, 372 [1980]; see also Terry, 392 US at 27; United States v Jackson, 652 F2d 244, 249 [2d Cir 1981], cert denied 454 US 1057 [1981]; see generally People v Coutin, 78 NY2d 930 [1991]). Once defendant DiSalvo emerged from the car with a gun visible on his waistband, Officer Valles had probable cause to arrest him. Likewise, when defendant Argyris exited the car wearing a bulletproof vest, Valles had probable cause to believe that Axgyris was also involved in armed activity, as is often true of those who wear bulletproof vests. Because Valles’s observations further corroborated the 911 caller’s allegations that the men had guns in their car, Valles had the right to search the passenger compartment of the car for additional signs of the gun possession mentioned by the *1166 caller (see Arizona v Gant, 556 US 332, 335 [2009]). Upon doing so, Valles lawfully recovered ammunition in the backseat, corroborating the caller’s claim that he had seen defendants or their companions place a gun in the back of the car. Since the record does not support a finding that the police violated defendants’ federal or state constitutional rights, I agree with the Court that the lower courts properly denied their suppression motions (see majority mem at 1140-1141).[4]
B
In People v Johnson, I conclude that the police unlawfully stopped defendant’s car based on an anonymous 911 call that did not set forth the basis of the caller’s knowledge of defendant’s alleged crime, as required under the second prong of the Aguilar-Spinelli test. The caller did not claim to have personally witnessed defendant illegally driving while intoxicated, and the caller neither made any prediction of defendant’s future behavior which might have suggested that he or she had insider knowledge of defendant’s affairs nor stated that he or she had learned of defendant’s acts from another credible source. In the absence of any such indicia of the basis of his knowledge, Cunningham improperly relied on the 911 call as a basis for stopping defendant’s car on suspicion of driving while intoxicated (see Spinelli, 393 US at 425 [White, J., concurring]; see also William II, 98 NY2d at 99). Moreover, the caller’s statements could not have caused Cunningham to reasonably suspect that defendant was committing a crime. The caller made a conclusory and equivocal assertion that defendant was “sick or intoxicated,” and he or she did not describe any particular action on defendant’s part that could have reasonably caused the police to accept her conclusion. Thus, the police could not have suspected defendant of anything more than “an isolated episode of past recklessness” (Navarette, 572 US at —, 134 S Ct at 1690).[5]
*1167 In addition, while Deputy Cunningham saw defendant commit a traffic violation, he lacked authority to pull defendant’s car over on this basis because he was outside his area of geographical jurisdiction and, thus, could stop a vehicle only on reasonable suspicion of conduct rising to the level of a crime. The violation did not confirm the reliability of the 911 call or provide Cunningham with reasonable suspicion of driving while intoxicated because, in context, defendant’s behavior appeared to be, at most, a brief sign of negligent driving consistent with a minor traffic infraction. When defendant made an illegal wide turn onto the street to his right, he entered the lane meant for oncoming traffic for a mere moment, quickly correcting himself in a way that belied suspicion of intoxicated driving.[6] Furthermore, defendant’s behavior prior to the stop also gave the Deputy no cause to question his sobriety. When Cunningham first saw defendant, he was properly stopped at a stop sign, and defendant then evidently made a lawful and steady turn onto Route 21. Thus, the entirety of the record does not support the lower courts’ finding that Cunningham reasonably suspected defendant of driving while intoxicated, and the courts below erred in concluding that Cunningham lawfully stopped defendant’s car and questioned him. And, because Deputy Drake’s actions were precipitated by the unlawful stop, the breath test results obtained by Drake should have been suppressed.[7]
*1168 IV
In People v Argyris and People v DiSalvo, I find that the lower courts did not err in denying defendants’ suppression motion. In People v Johnson, I believe the lower courts erred in failing to grant defendant’s suppression motion. Accordingly, in People v Argyris and People v DiSalvo, I vote to affirm the respective orders of the Appellate Division. In People v Johnson, I vote to reverse County Court’s order, grant the suppression motion and dismiss the accusatory instrument.

. Elsewhere on 31st Street, Officer Castelli stopped the grey van. With the aid of backup officers, Castelli detained and searched the occupants of the van, as well as the van itself, recovering a variety of evidence and contraband in the process. The legality of that police action is not presently before us.

. Although the caller’s demeanor, as reflected in the call, adds to his credibility, the mere fact that he called 911 contributes little, if anything, to the credibility determination. In that regard, I reject the Supreme Court’s suggestion in Navarette that most people avoid giving false reports to a 911 operator because they know that the 911 emergency system can record their voices, telephone numbers and, maybe, locations (see Navarette, 572 US at —, 134 S Ct at 1689-1690). Rather, I agree with the Navarette dissenters’ conclusion that “[tjhere is no reason to believe that your average anonymous 911 tipster is aware that 911 callers are readily identifiable” in such a precise manner (see 572 US at —, 134 S Ct at 1694 [Sealia, J., dissenting]). At most, a 911 caller might have a vague inkling that, on the off chance the operator can deduce the caller’s identity from the contents of the tip or somehow later learn the caller’s identity from another source, the caller might face significant negative repercussions for lying in a 911 call. That awareness provides only the slightest additional indicium of the caller’s credibility.

. Defendants do not include the words “just went” in their transcription of the call in their brief, but those words are discernable on the audio recording of the call admitted into evidence at the hearing. In any event, the context and contents of the call as a whole indicated that the caller was making a roughly contemporaneous report.

. In light of this conclusion, I do not reach the People’s alternative argument for upholding the stop based in part on the fellow officer rule.

. Defendant’s appendix includes an affidavit from the 911 caller, which she completed sometime after the call and in preparation for trial. In the affidavit, the caller revealed her identity and described the circumstances that prompted her to call 911. In the facts and argument sections of their brief, the People seek to focus our attention on the contents of this affidavit in the course of arguing that the tip’s reliability was established. However, the People failed to present this evidence to Town Court at the suppression hearing, and we cannot consider it. As we have repeatedly made clear, on a direct appeal, the parties in a criminal action are bound by the contents of the *1167 record in the court of first instance, and we generally cannot consider matters which are outside the record developed below (see e.g. People v McLean, 15 NY3d 117, 121-122 [2010]; see generally Rules of Prac of Ct of Appeals [22 NYCRR] § 500.14; cf. People v Alomar, 93 NY2d 239, 247-248 [1999] [discussing the process by which a party may move to expand the appellate record and hold a reconstruction hearing]). I would strongly admonish litigants in this Court — both those preparing the appendices and those making arguments based on the contents thereof — that, if they do not request permission for reconstruction of the record, they are not to seek an unfair advantage over their adversaries by relying on materials that have not been tested in the crucible of adversarial proceedings in the court of first instance.

. I do not mean to suggest that a driver’s commission of a traffic infraction cannot contribute to an officer’s suspicion of intoxicated driving. But, here, defendant’s specific conduct in committing the infraction could not have supplied him with enough additional suspicion to meet the legal threshold for reasonable suspicion.

. On appeal, the People do not argue that Cunningham could have stopped defendant based exclusively on defendant’s commission of the traffic infraction, notwithstanding that CPL 140.10 (2) (a) forbade Cunningham to arrest defendant for such a petty offense outside his territorial jurisdiction, or that the stop, even if it violated a jurisdictional statute, does not require suppression of the evidence (see Virginia v Moore, 553 US 164 [2008]). In addition, *1168 the parties have not discussed the procedural aspects of such a potential claim, including any preservation issues and the possibility of a LaFontaine issue (see People v LaFontaine, 92 NY2d 470 [1998]) arising from County Court’s express rejection of the notion that the traffic violation, without more, gave the Deputy legal authority to stop the car. Given that the People have not asked us to uphold the stop exclusively on authority of the traffic violation and there may be procedural obstacles to doing so, I express no opinion on any of the aforementioned matters, and the Court likewise does not address those issues (see majority mem at 1141).